CORRIGAN, J.
(dissenting). I dissent. In one fell swoop, the majority permits unlimited interference by courts in the local educational process and rewrites the entire constitutionally based legal doctrine governing stand *388 ing in Michigan. Contrary to the majority’s decision, the lower courts correctly concluded that the plaintiff teachers here have no statutory right to demand the permanent expulsion of four particular children, and potentially innumerable other children, from all Michigan schools. Under any meaningful test for standing, plaintiffs cannot enlist the courts to compel locally elected school boards to expel students under the circumstances presented here.
The majority reverses the lower courts’ rulings, however, by creating a vague new standing “test”— which is really no test at all — that violates the constitutional separation of powers mandate and gives courts unbounded discretion to overturn the decisions of other branches of government. In its haste to overrule this Court’s standing jurisprudence, instead of addressing the issues framed by the parties, the majority asks and answers a question solely of its own making: whether Lee v Macomb Co Bd of Comm’rs, 464 Mich 726; 629 NW2d 900 (2001), was correctly decided.[1] In doing so, the majority jettisons years of binding precedent on the basis of four justices’ current estimation that the public would be better served by opening the courts to all manner of challenges to acts of the legislative and executive branches. In overruling numerous cases, the majority throws into question the analyses and results in no fewer than eight significant, precedent-setting disputes including: Manuel v Gill, 481 Mich 637; 753 NW2d 48 (2008); Rohde v Ann Arbor Pub Sch, 479 Mich *389 336; 737 NW2d 158 (2007);Mich Chiropractic Council v Comm’r of the Office of Fin & Ins Servs, 475 Mich 363; 716 NW2d 561 (2006); Associated Builders & Contractors v Dep’t of Consumer & Indus Servs Dir, 472 Mich 117; 693 NW2d 374 (2005); Mich Citizens for Water Conservation v Nestlé Waters North America Inc, 479 Mich 280; 737 NW2d 447 (2007); Nat’l Wildlife Federation v Cleveland Cliffs Iron Co, 471 Mich 608; 684 NW2d 800 (2004); Crawford v Dep’t of Civil Serv, 466 Mich 250; 645 NW2d 6 (2002); and, of course, Lee itself.
Moreover, in concluding that plaintiffs have standing here, the majority illustrates the fundamental problem with its approach: it adopts no meaningful limitations for a binding doctrine that applies in every civil lawsuit brought in this state. Here it opens the courthouse doors for any school teacher, volunteer, contractor or student to demand that a court expel children from their schools even though a local school board has concluded that expulsion was inappropriate. The majority thus authorizes courts not only to invade the provinces of school districts and the state board of education, but also to deprive children of their rights to public education without affording them any due process protections or legal representation. Indeed, none of the children targeted for expulsion are even named as parties in this suit. It is unfathomable that a court nonetheless has the power to permanently expel them from school — yet the majority so holds.
Critically, in overruling the entire body of Michigan’s existing standing jurisprudence, the majority eschews the clear understanding of the “judicial power” held by the framers of our state constitution. It also eliminates our workable, principled standing test, which mirrors that of the federal courts and of many state courts with constitutions similar to our own. Indeed no state in the *390 union incorporates explicit “case or controversy” language into its constitution, yet many states explicitly employ the federal test — which is rooted in the traditional case or controversy requirement — that we adopted in Lee.
Finally, in effecting these unprecedented changes to Michigan’s standing jurisprudence, the majority ignores the doctrine of stare decisis while paying lip. service to it. The majority inexplicably concludes that Lee was clearly wrongly decided, and that “Lee and its progeny departed dramatically from historical jurisprudence,” although each member of the current majority who served on this Court during the relevant time period — Justice CAVANAGH, Chief Justice KELLY, and Justice WEAVER — adopted Lee as the correct test at some point in the past.[2]
For each of these reasons, I vigorously dissent. I would affirm the decision of the Court of Appeals, which faithfully and appropriately applied the law of this state in concluding that plaintiffs did not have standing to pursue this action.
I. THE QUESTION PRESENTED
This case, brought by four Lansing teachers and their union, originally presented a straightforward question: can a teacher sue a school board for its failure to expel a student who allegedly assaulted that teacher? To be clear, this case does not ask whether the public has an interest in the welfare of its teachers; our desire for their safety is indisputable. Nor does the case ask whether § 1311a of the Revised School Code, MCL 380.1 *391 et seq., requires a school board to expel a student who “commits a physical assault at school against a person employed by or engaged as a volunteer or contractor by the school board,” MCL 380.1311a(l); the parties do not dispute the unambiguous language of this provision. Further, the defendant school board and school district do not argue that they may ignore this mandate despite their conclusion following a student disciplinary proceeding that a student committed a physical assault as defined by the code. Rather, the parties dispute whether plaintiffs have standing to intervene, by way of a collateral civil suit, when they disagree with defendants’ underlying decision that the acts of the students at issue did not constitute physical assaults for purposes of applying the mandatory expulsion provision of MCL 380.1311a(l).
Accordingly, this case specifically asks whether the courts may decide, at the behest of a particular teacher, that a school board must permanently expel a particular student without any notice to the student or his parents. The plaintiff teachers argued that they should be empowered to seek a court order directing permanent expulsion of students under MCL 380.1311a(l). The majority agrees and holds, under its broad new standard, that plaintiffs have standing to proceed.
This holding is contrary both to settled principles of law regarding when a party has statutory and constitutional standing to bring a claim, as well as to the result demanded by the particular facts and circumstances of this case. The school code itself clearly establishes that the mandate in MCL 380.1311a(l) is to be enforced by the state executive branch and the locally elected school boards. Moreover, it is for the school districts — not the courts or individual teachers — to decide whether a particular student committed an assault requiring ex *392 pulsion. Plaintiffs offer no justification for the judicial branch to usurp these powers, which are specifically delegated to other branches of government.
Finally, plaintiffs have never described how the courts could successfully intervene. Their analysis fails to account for the fact that a board’s decision to expel a student occurs only after a disciplinary proceeding where the student’s constitutional rights are protected and where the board must make a careful, discretionary, factual decision concerning whether the student had the requisite intent to commit a “physical assault” as defined by the school code. According to the Michigan Association of School Boards, more than 100,000 such disciplinary proceedings occur in Michigan each school year. Yet plaintiffs seek to intervene after the fact in a case where the students are not represented, asking the Court to revisit and overrule innumerable decisions of the elected school boards. Moreover, plaintiffs never explain why other enforcement mechanisms — including not only the explicit statutory enforcement provisions, but also negotiations with the school board under their collective bargaining agreement — are inadequate to ensure appropriate enforcement of the applicable statute.
Thus, like the lower courts, I cannot conclude that teachers have standing to obtain court orders compelling expulsion of students in contravention of a school board’s decision that the students’ acts did not require expulsion. Perhaps most significantly, by choosing to overrule this Court’s constitutional standing doctrine sua sponte, the majority gives the courts carte blanche to invade the school board’s decision-making province, depriving those boards of their constitutionally delegated responsibilities and depriving students of their rights to public education without affording them due process. This case thus illustrates the absolutely unten *393 able nature of the majority’s new approach — an approach that, unfortunately, is characteristic of the majority’s assault on the rule of law.
A. LOCAL SCHOOL DISTRICTS AND THE REVISED SCHOOL CODE
1. GENERAL POWERS AND DUTIES OF SCHOOL DISTRICTS
The Revised School Code, originally enacted in 1976,[3] describes the “rights, powers, and duties” of school districts. MCL 380.11a(3). The powers and duties originate from the Michigan Constitution, which established that the “legislature shall maintain and support a system of free public elementary and secondary schools . . . .” Const 1963, art 8, § 2. Consistent with this mandate, the Legislature enacted the school code and provided that school districts would be governed by locally elected school boards. MCL 380.11a(5), (7). The constitution also vested “[Leadership and general supervision over all public education” in the elected members of the state board of education. Const 1963, art 8, § 3.
Significantly, both the constitution and the school code make plain that school districts’ central purposes are the education and protection of students. Const 1963, art 8, § 2, requires a system of free public schools and states simply: “Every school district shall provide for the education of its pupils without discrimination as to religion, creed, race, color or national origin.” The school code, in turn, defines district functions to include “[ejducating pupils,” MCL 380.11a(3)(a), and “[providing for the safety and welfare of pupils while at school or a school sponsored activity or while en route to or from school or a school sponsored activity,” MCL 380.11a(3)(b). A district’s functions with regard to *394 employees, however, center on “[h]iring, contracting for, scheduling, supervising, or terminating employees, independent contractors, and others to carry out school district powers.” MCL 380.11a(3)(d).
2. DISCIPLINARY POWERS AND DUTIES OF SCHOOL DISTRICTS
School districts’ powers and duties with regard to students include disciplinary measures subject to varying degrees of discretion by the board and its employees. For example, a district has discretion to suspend or expel a student who is “guilty of gross misdemeanor or persistent disobedience if, in the judgment of the school board or its designee, as applicable, the interest of the school is served” by suspension or expulsion. MCL 380.1311(1). A school board must permanently expel[4] a student under certain circumstances, including possession of a weapon (subject to some exceptions), arson, or criminal sexual conduct on school grounds. MCL 380.1311(2). Even under these circumstances, however, the student or his parent may petition for reinstatement to public education when a period of up to 180 days has elapsed after his expulsion. MCL 380.1311(5).
The statutory provision at issue in this case, MCL 380.1311a(l), was added to the school code by the Legislature in 1999 as one of several bills — including the safe schools and communities law, 1999 PA 23— addressing school safety and student discipline.[5] The 1999 bills mandated a statewide school safety information policy to be collaboratively adopted by the Superintendent of Public Instruction, the Attorney General, *395 and the director of the Department of State Police. MCL 380.1308(1). The bills also enacted guidelines for student discipline under various circumstances and established strict discipline academies, MCL 380.1311b, for particular students, including those expelled from their regular public schools, MCL 380.1311g(3)(b) and (c).
MCL 380.1311a(l) requires permanent expulsion “[i]f a pupil enrolled in grade 6 or above commits a physical assault at school against a person employed by or engaged as a volunteer or contractor by the school board” and the assault is properly reported to school officials. For purposes of this section, “physical assault” means “intentionally causing or attempting to cause physical harm to another through force or violence.” MCL 380.1311a(12)(b).
3. ENFORCEMENT
The school code’s provisions are enforced by several mechanisms. First, school board members, school officials, and any “other person who neglects or refuses to do or perform an act” required by the code, or “who violates or knowingly permits or consents to a violation” of the code, is subject to misdemeanor prosecution. MCL 380.1804. Second, under MCL 380.1806, a school board “may dismiss from employment and cancel the contract of a superintendent, principal, or teacher who neglects or refuses to comply” with the code. Third, because the members of school boards and the state board of education are elected officials, their acts and policies are regularly reviewed — and accepted or rejected — by the electorate.
It is also significant that the Legislature has enacted a comprehensive, carefully monitored scheme to address safety within our schools. For example, the statewide school safety information policy requires school *396 officials to report various school incidents to law enforcement agencies for investigation. MCL 380.1308(2)(a) and (3). Incidents that require reporting under this section are defined by members of the executive branch, MCL 380.1308(1), “taking into account the intent of the actor and the circumstances surrounding the incident,” MCL 380.1308(2)(b). School boards are required to submit reports that state the number of students expelled during each year and the reasons for expulsion, MCL 380.1310a(l), and list crimes, including those “involving physical violence,” committed at schools, MCL 380.1310a(2). These reports are ultimately intended, in part, to help policymakers, school districts, communities, and law enforcement officials “identify the most pressing safety issues confronting their school communities,” “enhance campus safety through prevention and intervention strategies,” “prevent further crime and violence and. . . assure a safe learning environment for every pupil.” MCL 380.1310a(2)(c) and (d). Finally, it is noteworthy that many school districts are now empowered to create law enforcement agencies within their school systems. MCL 380.1240.
B. TEACHERS’ STANDING TO SUE UNDER SECTION 1311a OF THE REVISED SCHOOL CODE
1. STANDING AND GROUNDS FOR COURT INTERVENTION
Despite the Legislature’s comprehensive system, through which executive branch officials and local districts set evolving policies and monitor responses to school safety, the plaintiff teachers here ask the courts to intervene and dictate the Lansing School District’s responses to four past incidents — and potentially innumerable future incidents — involving student misbehavior. Each of the named plaintiffs alleges that she was *397 physically assaulted by a middle school student[6] and, therefore, that the court should order permanent expulsion of each student under MCL 380.1311a(l). Plaintiffs further asked the court to: permanently enjoin defendants from violating MCL 380.1311a in the future; find school officials and board members guilty of misdemeanors for violating the school code under MCL 380.1804; and cancel the contracts of the superintendent and any principal for failing to comply with the school code under MCL 380.1806.
Plaintiffs sought this relief by requesting a declaratory judgment under MCR 2.605, which permits a court to “declare the rights and other legal relations of an interested party seeking a declaratory judgment.. . .” MCR 2.605(A)(1). They also sought a writ of mandamus under MCR 3.305, which requires a plaintiff to prove “it has a clear legal right to performance of the specific duty sought to be compelled and the defendant has a clear legal duty to perform such act.” Baraga Co v State Tax Comm, 466 Mich 264, 268; 645 NW2d 13 (2002) (quotation marks and citations omitted). Defendants moved for summary dismissal of plaintiffs’ complaint, arguing that plaintiffs did not have standing to seek either remedy.
*398 Traditional standing principles apply to plaintiffs seeking declaratory relief, Associated Builders, 472 Mich at 125, or writs of mandamus, e.g. Detroit Fire Fighters Ass’n v Detroit, 449 Mich 629, 633; 537 NW2d 436 (1995). As this Court explained in Associated Builders, addressing declaratory actions:
“[I]f a court would not otherwise have subject matter jurisdiction over the issue before it or, if the issue is not justiciable because it does not involve a genuine, live controversy between interested persons asserting adverse claims, the decision of which can definitively affect existing legal relations, a court may not declare the rights and obligations of the parties before it.” [Associated Builders, 472 Mich at 125, quoting Allstate Ins Co v Hayes, 442 Mich 56, 66; 499 NW2d 743 (1993).]
Accordingly, Associated Builders explicitly held, in an opinion authored by Justice WEAVER, that the test enunciated in Lee, 464 Mich 726, governs standing in declaratory actions and, as here, in actions where a plaintiff seeks to enforce an alleged statutory right but the statute does not confer standing by its own terms. Associated Builders, 472 Mich at 127 n 16. Therefore, until today, plaintiffs bore the burden of establishing each of the following elements of standing in order to invoke court jurisdiction:
First, the plaintiff must have suffered an “injury in fact” — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) “actual or imminent, not ‘conjectural’ or ‘hypothetical.’ ” Second, there must be a causal connection between the injury and the conduct complained of — the injury has to be “fairly. .. trace [able] to the challenged action of the defendant, and not.. . th[e] result [of] the independent action of some third party not before the court.” Third, it must be “likely,” as opposed to merely “speculative,” that the injury will be “redressed by a favorable decision.” [Lujan v Defenders of Wildlife, 504 US 555, 560-561; 112 S Ct 2130; 119 L Ed 2d *399 351 (1992) (citations omitted); quoted and adopted by Lee, 464 Mich at 739; quoted and applied to declaratory actions in Associated Builders, 472 Mich at 126-127.]
Here plaintiffs have not established a legally protected interest in, or clear legal right to, expulsion of students under MCL 380.1311a(l). Plaintiffs also have not shown that defendants had a clear legal duty to expel the students under the facts presented or that plaintiffs’ interests can be addressed by a favorable court decision. Therefore, they cannot establish standing to seek relief against the school board under MCL 380.1311a(l).
2. THE ALLEGED RIGHT TO RELIEF ASSERTED BY PLAINTIFFS
Plaintiffs argue that the text of MCL 380.1311a(l) creates an enforceable right in teachers and a corresponding duty owed by school districts to teachers. To determine whether a plaintiff has standing created by a statute, the court begins by considering “the statutory language to determine legislative intent.” Miller v Allstate Ins Co, 481 Mich 601, 610; 751 NW2d 463 (2008). As an initial matter, many of the cases cited by plaintiffs on this point are inapposite because they address whether a statute creates or implies a right of action for damages against a private party.[7] The inquiry is different when, as here, a governmental agency is involved. Because governmental agencies are generally immune *400 from suit under the governmental tort liability act, MCL 691.1407,[8] a plaintiff may sue a governmental agency for damages only when the Legislature expressly so authorizes. Lash v Traverse City, 479 Mich 180, 194; 735 NW2d 628 (2007); Mack v Detroit, 467 Mich 186, 195-196; 649 NW2d 47 (2002). These cases do not establish that a plaintiff may infer a private cause of action for damages against a governmental agency. Rather, in a suit against a governmental agency, a plaintiff generally may seek only injunctive or declaratory relief upon showing that the particular plaintiff has a clear, legally enforceable right that the particular defendant had a duty to protect. Lash, 479 Mich at 196.
Some of the relief requested by plaintiffs is clearly unavailable because they improperly ask the court to require the executive branch and the school district to make discretionary decisions in a particular manner. Although a plaintiff may seek to compel the exercise of discretion through a writ of mandamus, he may not compel the exercise of discretion “in a particular manner.” State Bd of Ed v Houghton Lake Community Sch, 430 Mich 658, 666; 425 NW2d 80 (1988) (emphasis added). Courts are not empowered to require the school board to cancel an employee’s contract for fading to comply with the school code. Rather, MCL 380.1806 clearly establishes that a decision to terminate an employee under these circumstances lies within the board’s discretion because the statute states that the board “may” dismiss an employee for violating the code. A statute’s use of the word “may” in this context *401 conveys discretion to act; it does not require the act. See Warda v Flushing City Council, 472 Mich 326, 332; 696 NW2d 671 (2005). Similarly, a court has no power to find individual officials guilty of misdemeanors under MCL 380.1804 in this civil case. “The power to determine whether to charge a defendant [with a criminal offense] and what charge should be brought is an executive power, which vests exclusively in the prosecutor.” People v Gillis, 474 Mich 105, 141 n 19; 712 NW2d 419 (2006); Const 1963, art 3, § 2.[9] Indeed, not only is this a civil case, but plaintiffs failed to name any individual defendants, so no potentially liable individuals are even parties against whom relief may be sought.
Accordingly, the only obtainable relief sought by plaintiffs depends on their argument that they have a clear, legally protected right to the expulsion of the four students described in the complaint and, potentially, to innumerable future students. They stress that MCL 380.1311a(l) addresses assaults on a specific, circumscribed group of people — any “person employed by or engaged as a volunteer or contractor by the school board” — that includes teachers like themselves. But nothing in the code suggests that the statute therefore creates an enforceable right in, or a duty to, this group of people. As explained above, the text of the 1999 statutory amendments is aimed at creating a comprehensive, statewide program of student discipline governed by the state board of education and the local districts. There is no indication of a legislative intent to *402 create new rights in teachers beyond their explicit statutory and contract rights.[10]
Plaintiffs cite two cases in which courts entertained suits brought by teachers who sought interpretation of school code provisions: Detroit Federation of Teachers v Detroit Bd of Ed 396 Mich 220; 240 NW2d 225 (1976) (addressing the former code that predated the 1976 revised code), and Roek v Chippewa Valley Sch Dist, 122 Mich App 76; 329 NW2d 539 (1982). In Detroit Federation of Teachers, this Court agreed with the circuit court’s declaratory decision stating that the defendant board “shall enter into a written, individual contract with each ‘duly qualified’ teacher in its employ” because written contracts with teachers were required by former MCL 340.569, but we concluded that the lower courts erred by directing the kind of contract individual teachers would receive. 396 Mich at 222, 226. In Roek, the Court resolved the parties’ dispute over language in MCL 380.1236(2), concluding on the basis of undisputed facts that the plaintiff qualified, as a matter of law, as a teacher employed as a substitute teacher for 120 days or more during a school year and thus had the basic right to be given first opportunity to accept or reject a contract under certain circumstances. 122 Mich App at 78-79. Neither of these cases supports plaintiffs’ claim for standing here.
These cases were concerned with teachers seeking judicial action with regard to teacher contracts. Thus, the cases addressed issues germane to teachers as direct parties to statutorily specified employment relationships. Moreover, because the cases involved the defendants’ duties to teachers in the employment context, *403 the subject matter fell directly within the scope of specified district functions with regard to employees, which include “contracting.” MCL 380.11a(3)(d). More importantly, Detroit Federation of Teachers, in particular, is most significant for what it did not do. Although Detroit Federation of Teachers confirmed the mandatory requirement for written contracts under the school code, it reversed the circuit court’s writ of mandamus “directing the kind of contract particular teachers would receive.” 396 Mich at 224. It concluded that the “right protected by the code is the right to a written contract evidencing the employment relationship, not to a particular kind of contract.” Id. at 227. Accordingly, the court had no power to govern the details of the parties’ contractual powers and duties, which the statute left to be determined through their collective bargaining process or the grievance procedure provided by their collective bargaining agreement. Id.
The case before us does not arise from the parties’ request for the court to interpret, as a matter of law, mandatory statutory language addressing teacher contracts. Rather, the parties agree that the statutory language is unambiguous and needs no further interpretation. Instead, plaintiffs asked the court to revisit a school board’s discretionary factual decision as it relates to a disciplinary scheme governing defendants’ responses to student behavior in student disciplinary proceedings. Thus, instead of supporting plaintiffs’ argument, the holdings of Detroit Federation of Teachers and Roek depend on contrasting facts and illustrate that this case does not involve a statute creating a clear right in plaintiffs or a clear duty on defendants’ part as their employer.
Crucially, plaintiffs’ reasoning is by no means limited to teachers. Upon accepting plaintiffs’ claim that they *404 have an enforceable right under MCL 380.1311a(l), the majority establishes that every person mentioned in the student disciplinary statutes now has standing to challenge a decision of a school board declining to expel a student who is accused of assault. As previously discussed, MCL 380.1311a(l) addresses disciplinary measures with regard to students who assault school employees, volunteers, and contractors. MCL 380.1310(1), in turn, addresses disciplinary measures when a “pupil enrolled in grade 6 or above commits a physical assault at school against another pupil.” The two provisions are similarly worded and, therefore, the majority’s conclusion that the teachers have standing to sue here applies with equal force not only to other school employees, volunteers and contractors, but to every student who alleges he was physically assaulted by another student. Yet nothing in the school code indicates that the Legislature intended to create a new right in all school volunteers, contractors, employees, or students to compel the expulsion of students, thus opening the floodgates for — and overwhelming the courts with— collateral litigation whenever one such person is dissatisfied with a board’s resolution of a student disciplinary proceeding. For these reasons, plaintiffs simply have not met their burden to show that the Legislature intended to create a legally protected right in teachers when it enacted MCL 380.1311a(l).
3. PLAINTIFFS’ REMEDIES
Plaintiffs’ claims fail primarily for the above reason: the Revised School Code does not clearly create legal rights in teachers to compel expulsion of students under MCL 380.1311a(l). But plaintiffs have also failed to show that the Legislature intended to authorize private suits to enforce MCL 380.1311a(l) or that the other *405 statutory enforcement mechanisms are not exclusive under these circumstances. These latter failures independently defeat plaintiffs’ claim that judicial relief is available to them in this case.
With regard to plaintiffs’ mandamus complaint, relief is available only if “the law has established no specific remedy” for a duty created by law. Houghton Sch, 430 Mich at 667. The cases cited by plaintiffs similarly hold that, when a right or duty is imposed by statute, “the remedy provided for enforcement of that right by the statute for its violation and nonperformance is exclusive.” Pompey, 385 Mich at 552. As already discussed, the Legislature clearly vested enforcement of the code and its provisions in the executive branch, through misdemeanor prosecutions under MCL 380.1804, and local school districts, which have discretionary power to terminate employees and officials who violate the terms of the code, MCL 380.1806. With regard to school safety, the code provides an additional layer of local and executive branch monitoring and enforcement through the statewide school safety information policy, MCL 380.1308, and reporting requirements, MCL 380.1310a. Thus, the code’s express terms provide particular remedies applicable to MCL 380.1311a. This should end the inquiry; these remedies generally should be deemed exclusive.
Plaintiffs argue, nonetheless, that they may still seek declaratory or mandamus relief if the statutory remedies are inadequate. This Court has never accepted the argument that courts may create new remedies for the violation of statutory duties on the basis of a party’s claim that existing statutory remedies are inadequate. In Lash, this Court rejected the argument — which is rooted in dictum from Pompey, 385 Mich at 552 n 14 — that an additional remedy might be permitted to *406 supplement a statutory remedy if the statutory remedy is “plainly inadequate”; we noted that this dubious principle “has never since been cited in any majority opinion of this Court” and “appears inconsistent with subsequent caselaw.” Lash, 479 Mich at 192 n 19. Plaintiffs nonetheless suggest that the principle was followed in a Court of Appeals case, Lane, 230 Mich App 696, which cited Pompey and Long v Chelsea Community Hosp, 219 Mich 578, 583; 557 NW2d 157 (1996), for the proposition that “a cause of action can be inferred from the fact that the statute provides no adequate means of enforcement of its provisions.” Yet Lane itself concluded that the plaintiff could not bring suit in part because the act at issue — the child care organizations act, MCL 722.111 et seq. — “adequately provides for enforcement of its provisions” through provisions similar to those present in the school code, including criminal penalties and proceedings instituted by the Attorney General. Lane, 231 Mich at 696. Notably, the comparable statutory remedies available in this case are ignored by the majority opinion.
In any event, plaintiffs certainly have not shown that the available enforcement mechanisms are inadequate. In addition to the statutory mechanisms discussed above — and in addition to the fact that school board members, as elected officials, must answer to the public for their acts and policies — plaintiffs never address why their contractual bargaining process is inadequate to address their safety concerns. Indeed, plaintiffs concede that their bargaining agreement with defendants includes provisions to protect the workplace safety of its members.[11] Thus, consistent with the code’s acknowl *407 edgment of the contract-based relationship between a teacher and a school district, it appears clear that plaintiffs not only have an enforcement mechanism at hand but — as in Detroit Federation of Teachers with regard to the non-justiciable contract terms — may make use of their bargaining process or grievance procedure to address alleged violations of their alleged rights to workplace safety. Defendants also reasonably argue that plaintiffs are clearly empowered to protect themselves by reporting alleged student assaults to their local prosecutor for criminal investigation.
Finally, in light of the broad powers the school code establishes in executive branch officials and local school boards, permitting individual plaintiffs to enforce MCL 380.1311a could violate both the terms of the code and the Michigan Constitution. Although this Court continues to debate the constitutional ramifications of our standing doctrine, we do not disagree about the constitutionally mandated separation of powers among our three branches of government: “No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in th[e] constitution.” Const 1963, art 3, § 2. Thus, it is clear that the courts cannot exercise powers expressly allocated to other branches of government. Here, the constitution expressly granted the power to create and supervise public schools to the state board of education, Const 1963, art 8, § 3, and the Legislature, Const 1963, art 8, § 2, which has delegated governance of the schools in part to the local school boards, MCL 380.11a(5) and (7). Accordingly, the constitution itself supports the conclusion that courts may not compel acts of the local school boards without express, constitutionally sound authorization to do so. The trial court made this very point in its decision granting summary disposition:
*408 Basically, the premise here is that this Court in some fashion or another has the right to look behind the exercise of discretion by the Lansing School District. I don’t think we have any more right to do that than we have to [sic] the Lansing City Council. The Lansing City Counsel [sic] is another branch of government. It’s not our prerogative. That’s not — that’s not something for the Court to do.
4. REDRESSABILITY AND THE EFFECTS ON STUDENTS’ CONSTITUTIONAL RIGHTS
On a related significant point, plaintiffs offer no workable means by which a court could enforce their alleged rights to expulsion of students under MCL 380.1311a(l) even if the court had some power to intervene through declaratory relief or a mandamus order. Plaintiffs’ failure in this regard informs and strengthens the conclusion that the statute does not create legally enforceable rights in, or duties to, plaintiffs at all.
Plaintiffs’ complaint depends entirely on their allegation that the four named students committed “physical assaults” as defined by the code. Plaintiffs tacitly proceed as if this allegation were undisputed or could be decided by the court. To the contrary, the parties agree that the factual determination whether a student committed a physical assault for purposes of the school code is a discretionary one for the school board. Although no authority suggests that a teacher has standing to appeal a school board’s disciplinary decision with regard to a particular student, the Court of Appeals has concluded that when a student appeals such a decision, “in reviewing the disciplinary orders of a school administration, the courts of this state are bound by that administration’s factual findings so long as they are supported by competent, material and substantial evidence.” Birdsey v Grand Blanc Community Sch, 130 Mich App 718, *409 723-724; 344 NW2d 342 (1983). Thus the courts have imported the highly deferential standard applicable to administrative agencies under Const 1963, art 6, § 28. Id. at 723. Birdsey also relied on Wood v Strickland, 420 US 308, 325; 95 S Ct 992; 43 L Ed 2d 214 (1975), which concluded that a court is bound to accept a school administration’s finding of fact if there is any evidence in the record to support it. Despite this deferential standard for direct appeals of administrative decisions, both the plaintiffs and the majority would accord no deference in a collateral appeal to the school board’s apparent determination that the four named students did not commit physical assaults as defined by MCL 380.1311a(12)(b).
Although we accept as true the facts alleged by a plaintiff in a complaint for purposes of a defendant’s motion for summary disposition under MCR 2.116(C)(8), Kuznar v Raksha Corp, 481 Mich 169, 176; 750 NW2d 121 (2008), plaintiffs’ characterization of each event as a “physical assault” as defined by MCL 380.1311a(12)(b) is a conclusion drawn from the statutory terms — not a fact.[12] Accordingly, a court cannot simply accept this allegation as true or presume that, if *410 the case proceeds, it can be resolved in plaintiffs’ favor by a finder of fact at trial. Rather, the allegation has apparently already been resolved to the contrary by the entity that plaintiffs concede is the proper forum — the school board. Under these circumstances, plaintiffs could achieve relief only if they can show, first, that the school board abused its discretion when it determined that the four students’ acts did not constitute physical assaults and, second, that the court has the power to conclude that the board erred and then to overturn the board’s determination in a suit brought by teachers. But plaintiffs never explain whether or how the court could review or overturn the board’s determinations in student disciplinary proceedings that have long since concluded, let alone by way of this collateral suit in which the students at issue are not even represented.
Indeed, all other issues aside, plaintiffs’ claims with regard to the four named students appear moot in any event because the disciplinary proceedings concluded years ago. The alleged assaults occurred in January 2007, September 2006, May 2006, and October 2005. Even if some of the students are still enrolled in the district, plaintiffs provide no authority suggesting that they could be expelled now, had they been expelled at the time of the incidents, by now each of them could have petitioned for reinstatement to public school under MCL 380.1311a(5)(b) (a court may grant a petition for reinstatement beginning 180 days after the date of expulsion).[13]
With regard to future students, plaintiffs do not explain how a declaratory judgment requiring defen *411 dants to comply with MCL 380.1311a(l) would have any effect whatsoever. Whether a student committed a physical assault is determined on a case-by-case basis depending on the particular facts and in accordance with the student’s constitutional rights. Therefore, the most a court could do would be to redundantly repeat the undisputed terms of the statute itself: “If a pupil enrolled in grade 6 or above commits a physical assault at school against a person employed by or engaged as a volunteer or contractor by the school board . . . , then the school board. . . shall expel the pupil from the school district permanently, subject to possible reinstatement . . . .” MCL 380.1311a(l) (emphasis added). Plaintiffs’ claimed relief thus supports defendants’ suggestion that what plaintiffs really desire is for the court — or the plaintiffs themselves — to determine whether a “physical assault” occurred for purposes of applying MCL 380.1311a(l).
Finally, as noted, permitting plaintiffs’ complaint to proceed here permits any person who alleges he is the victim of student misbehavior to independently sue the board when the board concludes that the student’s acts did not qualify for mandatory suspension or expulsion. That is, under the majority’s analysis, any employee, volunteer, or contractor of the school may now collaterally sue on the basis of assault allegations under MCL 380.1311a(l). And any student may sue, seeking suspension or expulsion of a fellow student, on the basis of assault allegations under MCL 380.1310(1). And these suits may be filed although the student disciplinary proceeding is over and although the accused student’s rights are not represented because he is not a party to the lawsuit.
Crucially, neither the majority nor plaintiffs ever address the rights of the accused students. Students *412 have a property interest in their entitlement to public education that cannot be “taken away for misconduct without adherence to the minimum procedures required by [the Due Process Clause of the Fourteenth Amendment],” US Const, Am XIV Goss v Lopez, 419 US 565, 574; 95 S Ct 729; 42 L Ed 2d 725 (1975);[14] see also Birdsey, 130 Mich App at 726 (applying Goss). Accordingly, plaintiffs certainly cannot seek expulsion of students in the present proceeding, where the students are not represented and have no opportunity to contest plaintiffs’ allegations against them. Goss, 419 US at 579. Yet the majority permits plaintiffs to proceed, thereby rendering additional lawsuits — brought by the expelled students claiming violation of their rights— inevitable.
5. CONCLUSION: PLAINTIFFS CLEARLY LACK STANDING AND THE MAJORITY’S CONCLUSION TO THE CONTRARY ILLUSTRATES THE FATAL PROBLEMS WITH ITS NEW APPROACH TO STANDING
Plaintiffs have not borne their burden to show that they satisfy any of the applicable requirements for standing under Lee, as both lower courts correctly concluded. Plaintiffs have not shown that MCL 380.1311a(l) creates a legally protected and redressable interest in teachers for which the courts may provide relief, particularly in a case involving only the teachers and the school district, but not the students at issue. Further, the foregoing discussion shows that plaintiffs could not satisfy any meaningful standing test.
Indeed, plaintiffs could not assert standing even under the former tests the majority cites with approval. Significantly, the parties essentially agree that the *413 outcome here would be the same whether standing is analyzed under Lee, Detroit Fire Fighters, 449 Mich 629, or House Speaker v Governor, 443 Mich 560; 506 NW2d 190 (1993). We agree. First, as discussed above, we see no indication that the Legislature intended to create a right or “substantial interest” in plaintiffs, see House Speaker, 443 Mich at 572, by enacting MCL 380.1311a(l). Further, to the extent plaintiffs refer to their general interest in their personal safety while at work, this interest is separate and independent from the student discipline provisions of the Revised School Code; plaintiffs can protect this interest through all the normal channels, including contract negotiations and complaints to local law enforcement. Second, plaintiffs’ general interest in a safe school environment is analogous to the safety interests claimed by the plaintiffs in Detroit Fire Fighters, where Justice WEAVER agreed that the plaintiff firefighters and their collective bargaining unit did not have standing to challenge an alleged violation of the Detroit City Charter. Detroit Fire Fighters, 449 Mich at 631-632. Justice WEAVER concluded that the firefighters did not have a “substantial interest” that “will be detrimentally affected in a manner different from the public at large” although they claimed that lack of funding for additional firefighters subjected them to increased risk of injury, among other things. Id. at 633 (opinion by WEAVER, J.). Specifically, she opined that the plaintiffs could not show “injury distinct from the general citizenry” because a lack of firefighters also threatened injury to members of the general public who occupied buildings that catch fire. Id. at 638. The Legislature’s purported interests in ensuring safe and effective learning environments similarly benefit the public at large. Safe schools, and the removal of violent students when appropriate, benefit not only all employees, volunteers, contractors and *414 students, but also parents, families, and any other member of the public who has occasion to enter a school. Indeed, the entire community that supports a school system has “an interest” in school safety: safe school environments benefit taxpayers, who fund all aspects of school functions. Although not every member of the public is affected equally by school environments, the same was true in Detroit Fire Fighters-, clearly not every member of the public frequently finds himself at risk inside a burning building, and clearly firefighters find themselves inside burning buildings more often than other individual citizens.[15]
Yet the majority rejects this Court’s standing test and concludes, without any examination of the school code or the ramifications for students’ constitutional rights, that plaintiffs — and, by necessary analogy, all school employees, contractors, volunteers and fellow students — have standing. As I have explained, the school code is replete with clear indications that the Legislature did not intend to create a right of action in teachers under MCL 380.1311a(l) and intended for the school code to be enforced under MCL 380.1804 and MCL 380.1806. The majority concludes otherwise by simply observing that MCL 380.1311a “suggests that plaintiffs have a substantial and distinct interest.” (Emphasis added.) Then, without citation and contrary to the most essential tenet of statutory interpretation, the majority expressly departs from the statutory text and states that, although the Legislature has not unambiguously expressed an intent to confer standing, a court may confer *415 standing by consulting legislative history at will.[16] This assertion is indisputably erroneous. The proper interpretation of a statute always begins with the unambiguous statutory text. As this Court recently affirmed in a unanimous opinion authored by Chief Justice KELLY, the “first step” in discerning the intent of the Legislature “is to review the language of the statute.” Briggs Tax Service, LLC v Detroit Public Schools, 485 Mich 69, 76; 780 NW2d 753 (2010). “[W]e consider both the plain meaning of the critical word or phrase as well as “ ‘its placement and purpose in the statutory scheme.’ ” Sun Valley Foods Co v Ward, 460 Mich 230, 237; 596 NW2d 119 (1999) (citation omitted). If the statutory language is unambiguous, we presume that the Legislature intended the meaning expressed in the statute. Briggs Tax Service, 485 Mich at 76. Accordingly, as Justice CAVANAGH himself stated in In re MCI Telecom Complaint, 460 Mich 396, 411; 596 NW2d 164 (1999), “judicial construction is neither required nor permissible.” (Emphasis added.) Further, there has simply never been any question that, to determine whether the Legislature intended to confer standing under a particular statute, we employ the normal rules of statutory interpretation and proceed by “analyzing] the statutory language.” Miller, 481 Mich at 607, 610.
Therefore, as in all cases requiring us to interpret an unambiguous statute, resort to legislative history is inappropriate. In re Certified Question from the United States Court of Appeals for the Sixth Circuit, 468 Mich 109, 115 n 5; 659 NW2d 597 (2003). Further, even when reference to legislative history is appropriate, staff analyses created within the legislative branch “are entitled to little judicial consideration” because “[i]n no way can a ‘legislative analysis’ be said to officially *416 summarize the intentions of those who have been designated by the Constitution to be participants in this legislative process, the members of the House and the Senate and the Governor.” Id.[17] Indeed, the legislative analysis cited here expressly states: “This analysis was prepared by nonpartisan Senate staff for use by the Senate in its deliberations and does not constitute an official statement of legislative intent.” Senate Legislative Analysis, SB 0183, SB 0206, HB 4240, and HB 4241, July 21, 1999 (emphasis added).
Thus, the majority grants plaintiffs standing in direct derogation of the Legislature’s text and without any attention to the actual rights and remedies at stake, which include the constitutional rights of the unrepresented students. The majority’s application of its vague new test demonstrates the test’s unprincipled nature and far-reaching consequences. This Court’s opinion in Lee was aimed precisely at avoiding such consequences by acknowledging that courts do not have unfettered discretion to grant or deny standing at will, but should adhere to a common standard. A common standard prevents the expansion of the judicial power beyond its constitutional bounds which, in turn, protects both the rights of citizens and the separate purviews of the other branches of government.
II. LEE WAS CORRECTLY DECIDED AND ITS ARTICULATION OF STANDING IS A NECESSARY COMPONENT OF THIS STATE’S CONSTITUTIONAL JURISPRUDENCE
Relying on decades of developments in federal courts, the United States Supreme Court in Lujan set forth three elements so basic to the concept of what is needed *417 for any party to bring a lawsuit that it labeled this standard the “irreducible constitutional minimum” of federal standing jurisprudence. Lujan, 504 US at 560. First, a party wishing to bring a suit must have suffered a concrete and actual or imminent injury. Second, there must be a fairly traceable causal connection between the injury and the defendant’s conduct. And third, a legal decision in favor of the party must be likely to redress the harm. Id. at 560-561. By a nearly unanimous vote, this Court’s decision in Lee expressly incorporated this “irreducible constitutional minimum” into our state’s existing standing jurisprudence, Lee, 464 Mich at 740, in an effort to identify when the courts have the authority to exercise “[t]he judicial power of the state,” Const 1963, art 6, § 1. Because the doctrine of standing touches every civil lawsuit brought in this state, it is a doctrine of the utmost importance, with serious constitutional and practical implications.
Unfortunately, none of these considerations has deterred the majority in this case from reducing Michigan’s standing requirements from the clear, developed standards articulated in Lee and its progeny to a broad and amorphous principle that promises to be nearly impossible to apply in a society that operates under the rule of law. The majority does so by relying on arguments and legal theories that have been considered and rejected as inconsistent with Michigan’s constitutional requirements. The majority also does so notwithstanding that Lee and its progeny provided Michigan with a clear, well-understood standing framework that clarified the law for the better by identifying the proper scope of judicial authority. The majority today upends and reverses this entire body of Michigan law in vindication of the personal views of the majority justices, but to the detriment of this state’s constitutional jurisprudence.
*418 A. STANDING IS A CONSTITUTIONAL REQUIREMENT IN MICHIGAN
The Michigan Constitution both separates the powers of the various branches of government and limits the power of the judicial branch to hear cases when actual disputes exist. Thus, standing is a constitutional requirement. Because the Constitution vests “[t]he judicial power of the state .. . exclusively in one court of justice,” Const 1963, art 6, § 1, the source and boundary of this power is constitutional in nature. Lee therefore properly held that federal constitutional standards regarding standing may serve as a benchmark in Michigan.
Perhaps the most fundamental doctrine in American political and constitutional thought is the separation of powers of government into a tripartite system. This principle has been explicitly incorporated in Michigan’s constitutions.[18] The importance of distribution of power is reaffirmed explicitly in our current Constitution, which states: “The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.”[19] Const 1963, art 3, § 2. There can be no doubt, then, that the scope of the judiciary’s power is both created and constrained by Michigan’s Constitution.
*419 The Lee Court did not newly create this constitutional principle out of whole cloth. Contrary to the majority’s belief, and inconvenient to the majority’s conclusion, Michigan has- consistently acknowledged that the state’s constitution limits the judicial power to hearing disputes involving actual cases or controversies. Understanding this most basic of principles is imperative to defining what, precisely, this state’s doctrine regarding “standing” should be because there is a clear link between the doctrine of standing and the separation of powers. The United States Supreme Court made this clear in Allen v Wright, 468 US 737; 104 S Ct 3315; 82 L Ed 2d 556 (1984):
The requirement of standing ... has a core component derived directly from the Constitution. .. .
... [T]he law of Art. Ill standing is built on a single basic idea — the idea of separation of powers. .. .
. . . [Qluestions. .. relevant to the standing inquiry must be answered by reference to the Art. Ill notion that federal courts may exercise power only “in the last resort, and as a necessity,” and only when adjudication is “consistent with a system of separated powers and [the dispute is one] traditionally thought to be capable of resolution through the judicial process.” [Id. at 751-752, quoting Chicago & G T R Co v Wellman, 143 US 339, 345; 12 S Ct 400; 36 L Ed 176 (1892), and Flast v Cohen, 392 US 83, 97; 88 S Ct 1942; 20 L Ed 2d 947 (1968).]
The Court reaffirmed this principle in Lewis v Casey, 518 US 343, 349; 116 S Ct 2174; 135 L Ed 2d 606 (1996), stating that “the doctrine of standing [is] a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches.” In applying these principles as articulated in the Michigan Constitution, we have previously explained:
*420 As part of this endeavor to preserve separation of powers, the judiciary must confine itself to the exercise of the “judicial power” and the “judicial power” alone. “Judicial power” is an undefined phrase in our constitution, but we noted in Nat’l Wildlife that
“ [t]he judicial power has traditionally been defined by a combination of considerations: the existence of a real dispute, or case or controversy; the avoidance of deciding hypothetical questions; the plaintiff who has suffered real harm; the existence of genuinely adverse parties; the sufficient ripeness or maturity of a case; the eschewing of cases that are moot at any stage of their litigation; the ability to issue proper forms of effective relief to a party; the avoidance of political questions or other non-justiciable controversies; the avoidance of unnecessary constitutional issues; and the emphasis upon proscriptive as opposed to prescriptive decision making.” [471 Mich at 614-615.]
We went on in Nat’l Wildlife to distill this litany of considerations arising from the proper exercise of the “judicial power,” and we determined that “the most critical element” is “its requirement of a genuine case or controversy between the parties, one in which there is a real, not a hypothetical, dispute.” [Nestlé Waters, 479 Mich at 292-293 (brackets in original).]
Moreover, these basic principles have been affirmed time and again by Michigan courts, as this Court traced in Lee:
Concern with maintaining the separation of powers, as in the federal courts, has caused this Court over the years to be vigilant in preventing the judiciary from usurping the powers of the political branches. Early on, the great constitutional scholar Justice THOMAS M. COOLEY discussed the concept of separation of powers in the context of declining to issue a mandamus against the Governor in Sutherland v Governor, 29 Mich 320, 324 (1874):
“Our government is one whose powers have been carefully apportioned between three distinct departments, which emanate alike from the people, have their powers *421 alike limited and defined by the constitution, are of equal dignity, and within their respective spheres of action equally independent. One makes the laws, another applies the laws in contested cases, while the third must see that the laws are executed. This division is accepted as a necessity in all free governments, and the very apportionment of power to one department is understood to be a prohibition of its exercise by either of the others. The executive is forbidden to exercise judicial power by the same implication which forbids the courts to take upon themselves his duties.”
This position followed from the even earlier iteration of the standing doctrine by Justice Campbell in 1859 when, speaking for this Court, he said:
“By the judicial power of courts is generally understood the power to hear and determine controversies between adverse parties, and questions in litigation.” [Daniels v People, 6 Mich 381, 388 (1859) (emphasis added).]
Later, in Risser v Hoyt, 53 Mich 185, 193; 18 NW 611 (1884), this Court explained:
“The judicial power referred to is the authority to hear and decide controversies, and to make binding orders and judgments respecting them.” [Emphasis added.]
More recently, Johnson v Kramer Bros Freight Lines, Inc, 357 Mich 254, 258; 98 NW2d 586 (1959), reaffirmed this concept by quoting this portion of Risser. [Lee, 464 Mich at 737-738 (brackets in original).]
And this history is certainly not exhaustive. For example, in 1920 this Court relied on the separation of powers and the development of judicial power in declaring unconstitutional a statute that would have conferred standing upon citizens to invoke the jurisdiction of the courts “not in the determination of actual controversies where rights have been invaded and wrongs have been done, but in the giving of advice to all who may seek it.” Anway v Grand Rapids R Co, 211 Mich 592, 606; 179 NW 350 (1920). The Court explained:
*422 This court and the court from which this case came by-appeal draw their power from the Constitution. The power given to both under the Constitution was judicial power.... This act confers powers not judicial and requires performance of acts non-judicial in character. For these reasons it is void in its entirety. [Id. at 622.]
Following the decision in Anway, the Legislature amended the act to remove the offending provisions that had allowed courts to exercise powers outside of the case and controversy context, and this Court upheld the revised act in Washington-Detroit Theatre Co v Moore, 249 Mich 673; 229 NW 618 (1930). Notably, the Court found significant that the act had been amended to apply “only to ‘cases of actual controversy.’ ” Id. at 676. It concluded that “[t]here must be an actual and bona fide controversy as to which the judgment will be res adjudicata. Such a case requires that all the interested parties shall be before the court.” Id. at 677.
In House Speaker v State Admin Bd, 441 Mich 547, 556; 495 NW2d 539 (1993), this Court again recognized the indisputable relationship between standing and the separation of powers, holding that “[i]t would be imprudent and violative of the doctrine of separation of powers to confer standing upon a legislator simply for failing in the political process.” More recently, in Federated Publications, Inc v City of Lansing, 467 Mich 98; 649 NW2d 383 (2002), we reaffirmed and explicitly declared that the “principal duty of this Court is to decide actual cases and controversies.” Id. at 112, citing Anway, 211 Mich at 610, and In re Midland Publishing Co, Inc, 420 Mich 148, 152 n 2; 362 NW2d 580 (1984). As this history makes clear, Michigan has consistently acknowledged that our state constitution limits the judicial power to hearing cases involving actual cases or controversies.
*423 This is true notwithstanding the lack of an explicit “case or controversy” requirement in the Michigan Constitution. Indeed, exceptions to the general “case or controversy” limitation on judicial power have been explicitly made in the text of our Constitution itself, thereby recognizing the rule that a case or controversy is otherwise required. For example, Const 1963, art 9, § 32, confers upon “any taxpayer of the state” standing to bring suit to enforce the provisions of the Headlee Amendment. Const 1963, art 11, § 5, empowers “any citizen of the state” to bring injunctive or mandamus proceedings to enforce the civil service laws of the state. Perhaps most significantly, Const 1963, art 3, § 8, allows either house of the Legislature to request that this Court issue an advisory opinion on the “constitutionality of legislation.”
Indeed, the delegates’ discussion of this last section, when it was ratified at the Constitutional Convention, eliminates any doubt about the framers’ understanding of the judicial power in Michigan and directly confirms the Lee Court’s interpretation of the judicial power.[20] In considering whether the Court should have the power to issue advisory opinions in nonadversarial proceedings at the request of other branches of government, the delegates’ entire discussion was clearly premised on the unquestioned assumption that the judicial power, generally, was rooted in a case or controversy requirement. At the outset, Delegate Harold Norris explicitly asked with regard to the proposed section: “Does that mean that as far as this committee is concerned, they do *424 not wish to preserve the traditional notion that there must be a case or controversy presented before the court may exercise its judicial power!” 1 Official Record, Constitutional Convention 1961, p 1544 (emphasis added). When the question was raised whether the power to issue an advisory opinion would be equivalent to the courts’ preexisting power to issue declaratory judgments, Delegate Eugene Wanger similarly specified that the courts’ preexisting power, even in the arena of declaratory judgments, distinctly required “an actual controversy between individuals . ...” Id. at 1545. Delegate Raymond King may have expressed the understanding most clearly when he remarked:
We are indeed contemplating a very serious change in what I think to be the history and the tradition of justice in this country. Mr. Wanger has pointed out the troubles that the Massachusetts supreme court got into when they allowed themselves to leave the theory of case and controversy. [Id. at 1546 (emphasis added).]
Indeed, even with regard to the limited expansion[21] of judicial power represented by the proposed advisory opinion provision, delegates were expressly concerned that it would “adversely affeet[] the separation of powers doctrine ....” Id. at 1545 (Delegate Wanger); see also id. at 1546 (Delegate Jack Faxon indicating that the convention “should be wary of any violation of the *425 separation of powers”); id. at 1547 (Delegate King stating: “I think we have established through the English common law and our adherence thereto a system of justice, a system of separation of powers which has proven itself, and I think we ought to be very reluctant at this time to try something new.”).
The framers’ discussion on these points reinforces the Lee Court’s understanding of the judicial power and presaged the critical problems — which I express here and which have been expressed by my colleagues in the past — with expanding the judicial power beyond its traditional limit. It also reinforces our conclusion, in Nat’l Wildlife, that
[t]o the extent that the people of Michigan, through their constitution, have chosen to confer upon the judiciary three specific authorities potentially beyond the traditional “judicial power,” it seems unlikely that the people intended that any other such nontraditional authority could simply be incorporated as part of the “judicial power” by a simple majority of the Legislature. [471 Mich at 625.]
In sum, it is clear that the framers of Michigan’s constitution believed, first, that the judicial power is generally circumscribed by the case or controversy requirement and, second, that the only way to expand judicial power beyond the traditional case or controversy limitation was through affirmative amendment of the constitution. In accord, this Court has held that the constitutional standing test articulated in Lee must not be applied to limit judicial power otherwise expressly conferred in the Michigan Constitution. See Mich Coalition of State Employee Unions v Mich Civil Serv Comm, 465 Mich 212, 217-219; 634 NW2d 692 (2001).
Yet, since the decision in Lee, several members of the current majority have advanced the view that, because the Michigan Constitution does not expressly use the *426 words “case” and “controversy” like the federal constitution, Michigan has no constitutional standing requirement. This argument fundamentally misunderstands both the Michigan and federal constitutions and misapprehends the constitutional standing theory. In Nat’l Wildlife we explained that the provisions of the federal constitution describing the limited “cases” and “controversies” that federal courts have the power to hear
is not a definitional provision that seeks to give meaning to the “judicial power.” Rather, art III, § 2 is a provision defining the limited judicial power of the federal judiciary, in contrast to the plenary judicial power of the state judiciary. The respective legislative articles of the two constitutions are analogous to the judicial articles: the legislative article of the Michigan Constitution does not purport to define the authority of its Legislature (for example, nothing is said therein concerning its authority over marriage, divorce, child custody, child support, alimony, or foster care), while the legislative article of the federal constitution does affirmatively confer authority upon the Congress, article I, § 8. The state judicial power, as with the state legislative power, is plenary, requiring no affirmative grant of authority in the state Constitution. The federal judicial power, on the other hand, as with the federal legislative power, is limited. Such power is exclusively a function, or a creation, of the federal constitution, and, therefore, must be affirmatively set forth. In similar fashion, the federal judicial power must also be affirmatively set forth, for it is also a function, or creation, of the federal constitution. Thus, US Const, art III, § 2 does not define the “judicial power;” rather it defines what part of the “judicial power” within the United States belongs to the federal judiciary, with the remaining part belonging exclusively to the state judiciary. That art III, § 2 variously employs the terms “cases” or “controversies” is not to confer a particular meaning upon the “judicial power,” but merely is to employ words that are necessary to the syntax of allocating the “judicial power” between the federal and *427 state governments. The concurrence/dissents would confuse the allocation of a power with its definition, and would thereby define the federal “judicial power” in the narrowest possible manner by limiting it through reference alone to the existence of a “case.” Even from the perspective of the concurrence/dissents, is there no more permanent aspect of the “judicial power” than that it pertain to a “case”?
In fact, the “judicial power” in the Michigan Constitution, with the several exceptions enumerated [explicitly in the Constitution], is the same “judicial power” as in the federal constitution, and it is the same “judicial power” that has informed the practice of both federal and state judiciaries for centuries. These historical principles were recognized by Lee, and we continue to adhere to them today. [Nat’l Wildlife, 471 Mich at 626-628.][22]
*428 Yet this argument that Michigan does not have a constitutional basis for its standing test — based on “caricatured textualism” that has been handily rejected — persists nonetheless.[23] In particular, Justice WEAVER has championed this dubious theory, which — given Chief Justice Kelly’s and Justice CAVANAGH’s recent metamorphoses on the issue of standing, and Justice HATHAWAY’s election to the Court — presents a convenient argument as the majority grasps at straws to explain why Lee and its progeny should be overruled. The fact remains that in neither the majority opinion in *429 this case, nor any of the majority justices’ concurring or dissenting opinions in prior cases, has a member of the majority ever articulated a sufficient response to these serious criticisms. This case has greater significance than prior cases, however, because the majority proceeds on these false understandings in order to remove altogether the limits imposed by our Constitution.
The proposition that Michigan courts are limited by an actual case or controversy requirement is beyond reproach. Michigan’s case or controversy requirement is not drawn from the federal “case or controversy” language, but rather the parallel limitations imposed in Michigan’s own constitution. This fact has been recognized by more than a century worth of Michigan caselaw, and thus it formed the basis for this Court’s decision in Lee to incorporate a standing test that reflected this reality. The majority’s author need only read his own opinions to realize as much. For example, in People v Richmond, this Court recently reaffirmed that “it is the ‘principal duty of this Court... to decide actual cases and controversies’ That is, ‘ “[t]he judicial power... is the right to determine actual controversies arising between adverse litigants, duly instituted in courts of proper jurisdiction.” ’ ” People v Richmond, 486 Mich 29, 34; 782 NW2d 187 (2010) (majority opinion by Cavanagh, J.) (citations omitted, emphasis added, ellipsis and brackets in original), citing Federated Publications, 467 Mich at 112, and Anway, 211 Mich at 610, 616.[24] These *430 principles apply with as much force in ensuring that this Court does not hear moot cases, or controversies that are not yet ripe.[25] More generally, one has to wonder whether the majority may also wish to overrule all Michigan cases that rely on federal precedent involving standing’s sister doctrines of mootness and ripeness? If not, the majority is left in the intellectually inconsistent position of defending those bodies of case-law, which have the same constitutional foundation regarding justiciability as the standing principles articulated in Lujan and Lee. Indeed, these doctrines are based exclusively on the very case or controversy requirement, implicit in the Michigan Constitution, that the majority here rejects.
*431 Like this Court in Lee, other courts have rejected the majority’s imprecise and overly broad analysis regarding the constitutional basis for standing on similar grounds. For example, in Bennett v Napolitano, the Arizona Supreme Court recently stated:
Article VI of the Arizona Constitution, the judicial article, does not contain the specific case or controversy requirement of the U.S. Constitution. But, unlike the federal constitution in which the separation of powers principle is implicit, our state constitution contains an express mandate, requiring that the legislative, executive, and judicial powers of government be divided among the three branches and exercised separately. This mandate underlies our own requirement that as a matter of sound jurisprudence a litigant seeking relief in the Arizona courts must first establish standing to sue. [Bennett v Napolitano, 206 Ariz 520, 525; 81 P3d 311 (2003).]
The majority’s flawed constitutional analysis allows it to advance the false dichotomy that this state’s standing jurisprudence must be based either on prudential concerns or on constitutional underpinnings, but not both. As the above analysis demonstrates, however, the constitutional separation of powers constraints explicitly provided in Michigan’s constitution give rise to minimal constitutional standing requirements, which this Court may augment when additional, prudential concerns arise.[26] Thus, the interpretation of Michigan’s constitution — in particular, its explicit limitations on judicial power and requirements of an actual case or *432 controversy — provides a direct basis for applying the prudent and well-defined federal test.
B. LEE AND ITS PROGENY: CREATING CERTAINTY IN MICHIGAN JURISPRUDENCE
Although the concept of “standing” touches every civil action filed in this state, prior to the adoption of the Lujan standard in Michigan this Court had only produced a general description of the principles governing standing. The most recent description that garnered support from a majority of this Court is found in House Speaker v State Admin Bd,[27] which stated:
Standing is a legal term used to denote the existence of a party’s interest in the outcome of litigation that will ensure sincere and vigorous advocacy. However, evidence that a party will engage in full and vigorous advocacy, by itself, is insufficient to establish standing. Standing requires a demonstration that the plaintiffs substantial interest will be detrimentally affected in a manner different from the citizenry at large. [House Speaker, 441 Mich at 554.]
Unsurprisingly, such a general proposition for a doctrine as important and far-reaching as standing proved difficult to apply. This fact became all too obvious in Detroit Fire Fighters, when this Court next examined Michigan’s standing doctrine. Detroit Fire Fighters resulted in a split decision in which no majority could be found to explain what elements were essential to standing in Michigan.[28] Indeed, although all four opinions cited the same boilerplate language from House Speaker in support of their respective positions, the justices did *433 not agree on such fundamental questions as what standing is in Michigan, what test should govern standing, and whether the plaintiffs had standing in that particular case.[29] This hodgepodge of disparate opinions compelled the Court to reach the merits of the case without a clear consensus on the threshold question whether the plaintiffs even had standing to bring the case.
This background formed the context in which this Court again confronted this state’s standing principles in Lee where, by a vote of six to one, this Court adopted and incorporated Lujan into our standing jurisprudence. As we stated then:
In our view, the Lujan test has the virtues of articulating clear criteria and of establishing the burden of demonstrating these elements. Moreover, its three elements appear to us to be fundamental to standing; the United States Supreme Court described them as establishing the “irreducible constitutional minimum” of standing. We agree. [Lee, 464 Mich at 740.]
Consistent with this Court’s constitutional obligations, the nearly unanimous majority in Lee correctly noted that the Lujan test provides a practical and workable framework for addressing what was previously an amorphous and often difficult concept. In its most basic form, the doctrine of standing can be properly reduced to the Lujan factors. What is standing if not the requirement that a plaintiff either has suffered or is in *434 imminent danger of suffering an actual harm, that the harm is allegedly caused by the defendant, and that the result of the court’s action can redress the wrong or injury? While the federal and state constitutions are not coterminous, they have developed on a parallel track, and the interpretation of federal constitutional law may inform state constitutional law when they share common elements. Although the majority has littered its opinion with instinctive repetitions that this state’s standing jurisprudence is “prudential,” the majority cannot explain what is imprudent about the “irreducible” and traditional description of the standing doctrine articulated in Lujan.
By introducing an objective framework based on three well-developed and readily understandable criteria — injury in fact, causation, and redressability— the Lee decision simplified and made more practical the doctrine of standing in this state. As is evidenced by how justices on this Court could not previously agree about what, exactly, standing meant in Michigan under House Speaker, 443 Mich 560, the Lee framework provides certainty. The progeny of Lee bear this out: in a decade’s worth of cases, Michigan trial and appellate courts have consistently and appropriately applied Michigan’s standing doctrine.[30] Indeed, during this time the doctrine itself has not changed. Only the personal views of justices on this Court — and only those who now overrule a decade’s worth of cases — have changed.
*435 As a matter of simple prudence and proper exercise of this Court’s constitutional authority, this Court is empowered to create clear rules that are easily accessible and applicable in the future. Aside from ensuring that Michigan courts only hear genuine cases and controversies in accord with its constitutionally mandated judicial powers, adopting the well-defined Lujan test provides the additional benefit of ensuring that Michigan’s standing doctrine is guided by clearly articulated and well-developed rules. A well-understood and practical standing test serves to uphold the separation of powers and promote the sound administration of justice. Indeed, only such a framework can ensure that courts will be governed by the rule of law, which itself ensures equality of treatment under the law. Inexplicably, the majority apparently celebrates that, prior to Lee, Michigan’s standing doctrine suffered from inconsistent application, and, in some cases, was not analyzed or applied at all.[31] Unfortunately, the majority’s test can promise no better in the future; this is particularly true since, by its explicit terms, standing can now be determined at the “discretion” of trial courts.
Notably, Lee did not supplant or “sacrifice” this Court’s standing jurisprudence, as the majority in this case erroneously states. Eather, it adopted the Lujan test as a means of “supplementing the holding in House Speaker [441 Mich 547], as well as this Court’s earlier standing jurisprudence, e.g., Daniels and Risser.” Lee, 464 Mich at 740 (emphasis added). The majority today is not so kind. Characteristic of its reckless treatment of this Court’s precedent and its willingness to rewrite entire areas of the law rather than letting them develop over time, the majority today jettisons a decade of this state’s caselaw, which itself was based on nearly a century of *436 rules and principles developed by the United States Supreme Court. And it does so in favor of what? A general, one paragraph articulation of “prudential” standing that proved so utterly unworkable a mere fifteen years ago under House Speaker, 443 Mich 560. Michigan citizens deserve better from their highest court.
Reliance on the accessible and well-understood federal test was a proper and prudent course of action for this Court to take in Lee. Indeed, this Court has often affirmed the principle that it is not questioned that the “powers of Michigan’s judiciary ... are modeled after the federal judiciary ....” Charles Reinhart Co v Winiemko, 444 Mich 579, 592 n 24; 513 NW2d 773 (1994) (opinion by Riley, J.); see also Nat’l Wildlife, 471 Mich at 627-628. This is particularly true in the context of standing where “Michigan courts previously have relied upon federal authority when deciding standing questions.” House Speaker, 441 Mich at 560 n 21. And Michigan is not alone. Because states’ judicial powers are plenary whereas federal judicial power is limited, no state in this country has an explicit “case or controversy” requirement in its constitution analogous to that of the federal constitution. Nonetheless, nearly half the states have adopted the Lujan test or its equivalent as their own in accordance with their state constitutional requirements regarding standing.[32] Like this Court in *437 Lee, these states realize the wisdom behind the federal *438 standing test and how it provides a practical and workable standing framework that operates within the bounds of their similar constitutional separation of powers requirements by giving meaning to those requirements. Moreover, no state’s highest court has adopted the federal standing test as its own only to decide, a few short years later, to abandon the doctrine and return to a prior amorphous test that parties and the courts found difficult to apply. Although Justice WEAVER repeatedly calls the test established by Lee “unprecedented,” clearly it is the majority’s decision today — not Lee — that defies precedent.
Ultimately, the majority’s decision today redounds only to the benefit of those who wish to use the courts — the least politically accountable branch of government — to *439 legislate and regulate increasingly larger spheres of Michigan life and politics.[33] In this regard, we are quite sure the majority opinion suffers from a typographical error when it states that “[w]e hold that Michigan standing jurisprudence should be restored to a limited, prudential doctrine,” because what the majority gives us today is anything but a “limited” doctrine. Indeed, with this case, the majority overrules those principles and rules that ensured that the doctrine would have articulated and meaningful limits in Michigan. Writing for the Court in Nat’l Wildlife, Justice MARKHAM foreshadowed the unfortunate turn of events altering Michigan’s standing jurisprudence that today has come to pass:
By their diminishment of a traditional check and balance upon the exercise of the “judicial power,” the concurring/dissenting Justices [CAVANAGH, KELLY, and WEAVER] would, if their position were ever to gain a majority, inflict considerable injury upon our system of separation of powers and the rule of law that it has produced. [Nat’l Wildlife, 471 Mich at 628.]
Justice HATHAWAY has now provided those justices with their fourth vote, and with it surely will come the inevitable breakdown of the rule of law in the domain of standing that only Lee and its progeny had stood athwart.
III. THE MAJORITY’S SELF-SERVING AND INCONSISTENT APPROACH TO THE DOCTRINE OF STARE DECISIS
Finally, the far-reaching, deleterious impact of the majority’s decision in this case is equally inherent in its methods for overruling significant, precedential opinions of this Court. The majority’s claim that it has good reason to overrule Lee and its progeny, in contravention of the doctrine of stare decisis, is bankrupt and self- *440 serving. Most significantly, in jettisoning Lee, the four justices constituting the majority fail to apply any agreed-upon test to examine whether this change in law is justified. The only clear commonality is their shared conclusion that Lee was clearly wrongly decided. This conclusion is mystifying because it is directly counter to the past positions of three members of the current majority, who supported Lee — and the case or controversy requirement underpinning Lee — in previous cases. Finally, the majority’s determination that overruling Lee will benefit the public depends entirely on circular, self-serving reasoning; the majority simply concludes that its preferred regime would better serve the public without any attention to the actual desires of the Michigan public — as expressed, for example, in the Michigan Constitution — or to the commonplace conclusion of courts throughout the nation that the test articulated in Lujan well serves the nation’s courts and citizens.
A. THE MAJORITY’S STANDARDLESS APPROACH TO OVERRULING PRECEDENT
In Robinson v Detroit, 462 Mich 439; 613 NW2d 307 (2000), this Court articulated several factors for consideration before a court should overrule established precedent. “The first question, of course, should be whether the earlier decision was wrongly decided.” Id. at 464. But “the mere fact that an earlier case was wrongly decided does not mean overruling it is invariably appropriate.” Id. at 465. Rather, “[cjourts should also review whether the decision at issue defies ‘practical workability,’ whether reliance interests would work an undue hardship, and whether changes in the law or facts no longer justify the questioned decision.” Id. at 464.
*441 The majority’s conclusion that Lee was wrongly decided is untenable. The test Lee enunciated is loyal to the Michigan Constitution, is consistent with our jurisprudence, and has been adopted and successfully applied throughout the nation by states with constitutions similar to our own. Next, there is no indication that the Lee test “defies ‘practical workability,’ ” that “reliance interests would work an undue hardship,” or that “changes in the law or facts no longer justify” it. Robinson, 462 Mich at 464. To the contrary, in standardizing factors for standing throughout the state based on the well-established and accepted federal test, Lee created a predictable analytic tool. It thus enhanced workability for courts and parties and protected parties’ interests from potentially unanticipated discretionary decisions of individual courts, which did not have the benefit of concrete, guiding principles before Lee.
In jettisoning this Court’s constitutional standing jurisprudence, however, Justice CAVANAGH chooses not to rely on the Robinson factors. Instead, he cites Chief Justice Kelly’s analysis in Petersen v Magna Corp, 484 Mich 300; 773 NW2d 564 (2009). There, the Chief Justice expressed her disapproval of Robinson.[34] Petersen, 484 Mich at 316-317. She thus articulated her own preferred standard, albeit while “neglecting] even to apply her new stare decisis standard to determine whether Robinson itself should be overruled.” Id. at 388 n 42 (Markman, J., dissenting). Only Justice CAVANAGH concurred in the Chief Justice’s stare decisis analysis in *442 Petersen, and only the Chief Justice expressly joins Justice CAVANAGH’s reliance on Petersen here.
In declining to join Justice CAVANAGH’s discussion of stare decisis, Justices WEAVER and HATHAWAY go one step further. In their concurrences, they expressly advocate no standardized approach to overruling precedent. Concluding that “[tjhere is no need for this Court to adopt any standardized test regarding stare decisis,” Justice WEAVER advocates for a “case-by-case” analysis based on undefined notions of “judicial restraint, common sense, and fairness.” Her application of these notions to this case exemplifies the unprincipled nature of her position. She simply advances the empty, circular conclusion: “In serving the rule of law and applying judicial restraint, common sense, and a sense of fairness to the case at hand, I agree with and join the majority opinion’s holding that Lee and its progeny are overruled.” Justice HATHAWAY describes a judge’s duty when deciding whether to overrule precedent as a “policy determination” that “will be dependent upon the facts and circumstances presented.” Like Justice WEAVER, she votes to overrule Lee based on an empty, unexplained conclusion: “the reasons for overruling Lee are paramount to any articulated test and the special and compelling justifications to do so are overwhelming in this case.”
Justices WEAVER and Hathaway have each espoused their troubling views that reviewing whether a case should be overruled is merely a “policy” determination that need not be guided by any standard in several other recent cases, including Univ of Mich Regents v Titan Ins Co, 487 Mich 289; 791 NW2d 897 (2010), and McCormick v Carrier, 487 Mich 180; 795 NW2d 517 (2010). Their professed approaches rely entirely on their personal, subjective views of the law. As Justice YOUNG *443 noted in his dissent to Univ of Mich Regents, their approaches are “the very antithesis of the ‘rule of law’. . . Univ of Mich Regents, 487 Mich at 325 (Young, J., dissenting). He observed:
The rule of law, by definition, requires judges to decide cases on the basis of principles, announced in advance, rather than on a personal or subjective preference for or against a party before them. This ensures stability in the law despite the diversity of judges’ personal beliefs. Whether we, as judges, “like” the outcome is, quite simply, irrelevant to whether it reflects a correct conclusion of law. It is harrowing that Justices WEAVER and HATHAWAY either do not understand this concept or refuse to subscribe to it, preferring to base their decisions on subjective “policy consideration[s].” [Id. at 327.]
Justice MARKMAN also warned that the primary problem with this approach is that
“litigants will, of coruse, have no notice beforehand of which [‘analytical approach’] will be employed, for the justices themselves will not know this beforehand.” Petersen, 484 Mich at 380 (Markman, J., dissenting). Under the concurring justices’ “analytical approaches,”
“there [would be] no consistently applied . . . process with which the judge promises beforehand to comply. He or she may promise to be ‘fair,’ and he or she may seek to be fair, but there are no rules for how this fairness is to be achieved. There is only the promise that the judge will address each [precedent] on a case-by-case basis, using whatever [‘policy considerations’] he or she believes are required in that instance. And the suspicion simply cannot be avoided that these varying and indeterminate [‘policy considerations’] may be largely a function of the outcome preferred by the judge and by his or her personal attitudes toward the parties and their causes.” [Id. at 340 n 10 (Markman, J., dissenting), quoting Petersen, 484 Mich at 381-382 (Markman, J., dissenting).]
These warnings have come full circle in this case where the majority overrules an entire body of law without *444 relying on any agreed-upon factors to decide whether overruling precedent is appropriate.
B. AFTER SUPPORTING LEE IN THE PAST, THE MAJORITY NOW INEXPLICABLY CONCLUDES THAT IT WAS WRONGLY DECIDED
Significantly, the majority’s decision to overrule Lee under the various “standards” espoused individually by each justice depends, of course, on its threshold conclusion that Lee was wrongly decided. But this conclusion itself is belied by the reliance of Chief Justice KELLY, Justice WEAVER, and Justice CAVANAGH on the wisdom of Lee. Chief Justice KELLY and Justice CAVANAGH expressly joined the Court’s adoption of the Lujan test in Lee. Lee, 464 Mich at 750 (Kelly, J., joined by CAVANAGH, J., dissenting but “agree[ing] with the majority’s adoption of the Lujan test”).[35] Indeed, Justice CAVANAGH was the first justice of this Court to propose adopting the Lujan test; he expressly employed and advocated for adoption of the Lujan test in concluding that the plaintiffs had standing in the fractured Detroit Fire Fighters decision. See 449 Mich at 651-652 (Cavanagh, J, dissenting in part). Justice WEAVER herself accepted Lee in Associated Builders, 472 Mich at 127 & n 16, where she explicitly held that Lee governs standing in declaratory actions and in cases where a plaintiff seeks to enforce an alleged statutory right but the statute does not confer standing by its own terms. These justices have also explicitly affirmed their agreement with the concept that the judicial power in Michigan is bounded by a case or controversy requirement. E.g., Richmond, 486 Mich at 34 (Cavanagh, J., joined by Kelly, C.J., and Markman and Hathaway, JJ.) (stating that “ ‘ “[t]he judicial power ... is the right to determine actual controversies arising between *445 adverse litigants, duly instituted in courts of proper jurisdiction” ’ ”) (citations omitted; ellipsis and brackets in original); In re Certified Question from the United States Dist Court for Eastern Dist of Mich, 622 NW2d 518, 519 (2001) (Weaver, J., dissenting) (“ ‘[judicial power’ ” is “ ‘the power to hear and determine controversies between adverse parties, and questions in litigation.’ ”) (citation and quotation marks omitted).
In light of these justices’ former positions, I am mystified at their current conclusions that Lee was not only wrongly decided, but was so misguided that we should now throw Michigan’s standing jurisprudence into turmoil in order to overrule Lee. Indeed, their result has every appearance of a mere power grab intended to ascribe broad, unconstitutional authority to the Court as it is now configured with this new majority at the helm. Ironically, Justice Weaver’s dissenting comments in In re Certified Question from the Fourteenth Dist Court of Appeals of Texas, 479 Mich 498; 740 NW2d 206 (2007), are apropos. There, she reiterated her lack of support for MCR 7.305(B), which permits this Court to entertain requests for advisory opinions from foreign courts, because the subrule “lacks any limiting language on when the Court may answer a certified question ....” Id. at 550 (Weaver, J, dissenting). A lack of express limits, she opined, “leav[es] the door and the docket open to the whims of the majority.” Id.
As if to illustrate her point, the majority underpins its supposed consideration of the doctrine of stare decisis with its conclusion that our constitutional standing doctrine is “at the expense of the public interest. .. because it may prevent litigants from enforcing public rights, despite the presence of adverse interests and parties, and regardless of whether the Legislature in *446 tended a private right of enforcement to be part of the statute’s enforcement scheme.” But this self-serving, rhetorical formulation of the “public interest” is entirely of the majority’s own making.[36] It ignores that, in this case, there is no indication that the Legislature intended that plaintiffs have a private right to enforce the statute at issue. Most significantly, it ignores the public’s interest as expressed in our constitution, and explained in depth above, in courts that do not have unlimited power and, absent exceptions expressly provided by the constitution, should not exceed the traditional judicial power by intruding on the powers of the executive and legislative branches.
C. MICHIGAN JURISPRUDENCE IN TURMOIL: THE MAJORITY’S INCREASING WILLINGNESS TO OVERRULE PRECEDENT WITH WHICH IT DISAGREES
Thus the majority continues to exhibit its absolute disregard for precedent inconvenient to its aims without regard to the consequences. As Justice MARKMAN emphasized in his dissent to the majority opinion in McCormick, 487 Mich at 265-266:
Even a cursory analysis of the majority’s treatment of precedent since it ascended to power in January 2009 reveals a lack of sufficient regard for recent precedents that is directly contrary to their own previous assertions of the need not to needlessly overrule cases on account of stare *447 decisis. Past complaints on their part that cases should not be overruled when the only thing that has changed is the membership of the Court have gone by the wayside.
“[A]ll the justices who comprise the majority . .. should more clearly recognize the consequences of what they are doing.” Id. at 265 (emphasis omitted). Indeed, in overruling numerous significant cases of this Court— the growing list of which is catalogued in McCormick by Justice MARKMAN, id. at 266-273 — in the brief period since the current majority came to power in January 2009, I find the majority’s feigned adherence to the doctrine of stare decisis here hard to swallow. Nothing about the majority’s decision today “ ‘promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, [or] contributes to the actual and perceived integrity of the judicial process.’ ” Ante at 367, quoting Payne v Tennessee, 501 US 808, 827; 111 S Ct 2597; 115 L Ed 2d 720 (1991). Rather, the majority throws into turmoil a well-accepted and constitutionally sound standing doctrine applicable to every civil suit filed in this state that this Court adopted to rectify the total uncertainty in this area that was evident in cases such as Detroit Fire Fighters, 449 Mich 629. Accordingly, I am nonplussed by Justice CAVANAGH’s ironic lip service to Alexander Hamilton’s warning that, “to ‘ “avoid an arbitrary discretion in the courts, it is indispensable that [courts] should be bound down by strict rules and precedents which serve to define and point out their duty in every particular case that comes before them ....”’” Ante at 366, quoting Petersen, 484 Mich at 314-315 (opinion by Kelly, J.), quoting The Federalist No. 78, p 471 (Alexander Hamilton) (Clinton Rossiter ed, 1961).
Finally, as Justice MARKMAN has also illustrated, this case presents yet another troubling element of the *448 majority’s current unbounded disregard for precedent. Here as in several other recent cases, see McCormick, 487 Mich at 273-274, instead of accepting the issues as framed and argued by the parties throughout the case, the majority instead directed the parties to brief whether a decision by the former majority should be overruled. Yet, as noted, the parties to this case have always argued that Lee governs their dispute. Even plaintiffs — for whom the majority renders a favorable decision here — never challenged the correctness and applicability of Lee to their case. Further, although other groups and members of the public have participated in this case by filing briefs amicus curiae at the majority’s invitation, not a single brief supports plaintiffs’ argument that they have standing here.[37]
IV FURTHER RESPONSE TO THE MAJORITY
Rather than ash, the majority’s stare decisis analysis should taste like bile in their mouths: like a bulimic after a three day bender, the majority justices now purge a decade’s worth of vigorous protestations that they are committed to the principle of stare decisis. As Justice YOUNG demonstrates at length in Univ of Mich Regents, 487 Mich at 321-323 (Young, J., dissenting), members of the majority stridently defended stare decisis for many years when past cases supported their dissenting positions. Then-Justice KELLY summed up their posi *449 tion in Pohutski v City of Allen Park, 465 Mich 675, 712; 641 NW2d 219 (2002) (Kelly, J., dissenting), stating: “[I]f each successive Court, believing its reading is correct and past readings wrong, rejects precedent, then the law will fluctuate from year to year, rendering our jurisprudence dangerously unstable.” Yet here they overrule Lee, most notably without ever addressing their former adherence to the LeelLujan test.
As the Court established in Lee and as I recount here, Lee was built on this Court’s historical concepts of standing. By reversing the line of post-Lee cases here, the majority claims that it “brings this Court back to the status quo ante.” Unfortunately, the pre-Lee status quo resulting from House Speaker, 443 Mich 560, was confusion and bitter division regarding rules that provided no clear guidance regarding Michigan’s constitutional standing requirements.[38] It is this state to which the majority returns Michigan law. Lee did not sacrifice Michigan standing jurisprudence, as the majority persists in repeating, nor did Lee conclude that federal standing jurisprudence was expressly binding in Michigan. Rather, Lee favored the commonly accepted federal test which brought consistency to Michigan courts in light of our lack of a clearly articulated, workable test. Further, as members of the majority have recognized, there simply is no constitutional “conflict” that would prevent Michigan’s continued use of the Lujan/Lee test for standing.[39] These truths — as well as the overall *450 reasonableness of the Lee test — are evident in the near-unanimous acceptance of the test in Lee itself. How is it possible that the majority now rejects the very test suggested by Justice CAVANAGH himself in Detroit Fire Fighters, accusing the Lee Court of adopting a test that “casually displaced decades of inconsistent precedent,” “is likely to result in serious detriment to the public interest,” and is “contrary” to Michigan law? As Justice YOUNG has observed in a similar context,[40] United States Supreme Court Justice Antonin Scalia may have best described our concerns about the majority’s recent about-face with regard to stare decisis as well as its new approach to standing with the following observation:
Evidently, the governing standard is to be what might be called the unfettered wisdom of a majority of this Court, revealed to an obedient people on a case-by-case basis. This is not only not the government of laws that the Constitution established; it is not a government of laws at all. [Morrison v Olson, 487 US 654, 712; 108 S Ct 2597; 101 L Ed 2d 569 (1988) (Scalia, J., dissenting).]
Finally, although the majority criticizes me for actually addressing the questions presented in this case, my analysis is necessary precisely because the majority applies an unworkable, amorphous approach to standing. The lower courts had little trouble agreeing, in relatively brief decisions, that plaintiffs do not have standing under the principles enunciated in Lee. But the majority’s approach so obscures the reasons courts impose standing requirements in the first place that it *451 leaves the dissent in a position akin to one who must “prove a negative”; thus, I attempt to show why the lower courts’ conclusions that plaintiffs clearly could not proceed are indisputably correct under the terms of the statute invoked by plaintiffs to establish standing. Indeed, in light of the express terms of the school code, its enforcement procedures, and its disciplinary provisions, I am baffled by the majority’s conclusion, under its own new discretionary approach, that the trial court abused its discretion by concluding that plaintiffs could not proceed here. How is the majority’s new non-test for standing anything but a proclamation that it will decide, on the basis of personal policy considerations, whether a plaintiff may maintain a suit against a particular defendant?
The majority essentially concludes that plaintiffs have standing because their safety might have been one aim of MCL 380.1311a(l) without any regard to the Legislature’s actual intent or to the ramifications of this suit. For example, although no one in this suit represents students’ rights — and thus no one may consider their rights as the suit proceeds or in an eventual settlement — the majority presumes that the right result will simply come out in the wash after the complaint is authorized on standing grounds. Indeed, under the majority’s approach, what prevents anyone with a proclaimed “substantial interest” from suing a defendant such as the school board here in an attempt to trample on the rights of an unrepresented third party?[41] *452 Because a plaintiff no longer needs to show a concrete and particularized injury, or that the court actually has the power to grant relief to me from that defendant, or that the legislative body intended to create a cause of action, presumably any such plaintiff can proceed. Particularly by permitting plaintiffs to sue to enforce a governmental agency’s statutory duties with no attention to whether the Legislature intended to create a cause of action, the majority utterly ignores separation of powers principles including the Legislature’s sole purview to legislate such duties and to define the. proper mechanisms for their enforcement.[42]
*453 Consistent with the majority’s deconstruction of Michigan’s guiding legal principles over the last two years, the result boils down to this: in this state, anyone has standing to sue anyone else, any time. As in McCormick, 487 Mich 180, for example, where the majority significantly lowered the threshold for suits against Michigan drivers under our automobile no-fault insurance scheme,[43] the majority continues to encourage litigation at a high cost to individuals, the courts, local governments and local officials. This complete destabilization of established law benefits no one.
V CONCLUSION
For each of these reasons, I dissent. I would affirm the decision of the Court of Appeals, which reached the correct result and properly applied the law of this state. The majority’s conclusion that plaintiffs have standing here is devoid of any analysis and incorrect under any meaningful test. Its decision to grant standing here under an amorphous new test of its own making is unprincipled and opportunistic; in its haste to overrule *454 yet another precedent of this Court, it grants teachers the right to sue for expulsion of children from our public schools without any regard for the students’ rights. Finally, its choice to eschew the well-established Lee test aggregates limitless power in the courts, is contrary to our constitution, and will only damage the rule of law in our state.
YOUNG and MARKMAN, JJ., concurred with CORRIGAN, J.

 The parties addressed this issue only after the majority directed them to do so in this Court’s order granting plaintiffs’ application for leave to appeal. Lansing Sch Ed Ass’n v Lansing Bd of Ed, 485 Mich 966 (2009). Before this order issued — indeed, from the inception of this case — the parties agreed that Lee was the governing legal authority; each side affirmatively argued that Lee controlled and urged that Lee supported its position.

 See Associated Builders, 472 Mich at 126-127 (Weaver, J.); Lee, 464 Mich at 750 (Kelly, J., dissenting, joined by Cavanagh, J.); Detroit Fire Fighters Ass’n v Detroit, 449 Mich 629, 651-652; 537 NW2d 436 (1995) (Cavanagh, J., dissenting in part and concurring in part).

 1976 PA 451.

 Permanent expulsion generally means that a student may not attend any public school in Michigan. But expelled students may be eligible to attend alternative education programs and strict discipline academies or to receive in-home instructional services. MCL 380.1311(3).

 1999 PA 102 to 104; 1999 PA 23.

 Plaintiffs allege that one student threw a leather wristband with metal spikes, which hit a bulletin board “about two inches” from the plaintiff teacher’s head, bounced, and hit the teacher in the face. Plaintiffs further allege that two students separately hit plaintiff teachers with chairs. Each teacher suffered bruises as a result. A fourth student allegedly slapped a plaintiff teacher on the hack with enough force to cause stinging and to leave a pink mark. Plaintiffs state that each of these incidents was properly reported to school officials and each student was suspended but not expelled. The parties agree that the defendant school board apparently concluded that none of the four students named in the complaint committed “physical assaults” as defined by the code and, therefore, expulsion was not mandated by MCL 380.1311a(l).

 E.g., Gardner v Wood, 429 Mich 290, 312-314; 414 NW2d 706 (1987) (finding no implied cause of action against a private party for violating a provision of the former Liquor Control Act, MCL 436.26c); Pompey v Gen Motors Corp, 385 Mich 537, 552-553, 560; 189 NW2d 243 (1971) (permitting suit against a private employer for violation of the plaintiffs statutorily created civil rights); Lane v KinderCare Learning Ctrs, Inc, 231 Mich App 689, 695-696; 588 NW2d 715 (1998) (finding no implied cause of action against a private party for violating the child care organizations act, MCL 722.111 et seq.).

 A school district, its board members, and its employees generally qualify for governmental immunity. See MCL 691.1407(1) and (2) (establishing that a “governmental agency” and its board members and employees are generally immune from tort liability); MCL 691.1401(b) and (d) (defining “governmental agency” to include a "political subdivision” of the state and defining “political subdivision” to include school districts).

 See also People v Chavis, 468 Mich 84, 94 n 6; 658 NW2d 469 (2003): “It is invariably the case that the prosecutor always has great discretion in deciding whether to file charges. Such executive branch power is an established part of our constitutional structure.” The prosecutor’s powers in this regard are tempered by “systemic protections afforded defendants” incident to criminal trials and by “elections, which call all office holders to account to their constituents.” Id.

 The only authority plaintiffs cited to support their oft-stated conclusion that MCL 380.1311a(l) was specifically intended to protect employee safety is HB 5802, which became 2000 PA 230. But 2000 PA 230 did not enact MCL 380.1311a, as plaintiffs incorrectly assumed.

 Plaintiffs expressly affirm in their brief that the plaintiff union “has bargained language in its master agreement with Defendants-Appellees to protect the workplace safety of its members.”

 Compare Davis v Detroit, 269 Mich App 376, 379 n 1; 711 NW2d 462 (2006) (“Plaintiffs reliance on her allegation in her complaint that the city was engaged in a proprietary activity is unwarranted because only factual allegations, not legal conclusions, are to be taken as true under MCR 2.116(C)(7) and (8).”). Moreover, although plaintiffs have not properly placed in issue the school board’s determinations, I note that the students’ alleged acts, see note 6 of this opinion, do not unquestionably constitute physical assaults under MCL 380.1311a(12)(b), as plaintiffs simply presume. Particularly because the statutory definition of “physical assault” includes a specific intent element — “intentionally causing or attempting to cause physical harm,” MCL 380.1311a(12)(b) — the finder of fact at a disciplinary proceeding could conclude, on the basis of the mental state of the student or the circumstances surrounding each assault, that the student did not affirmatively intend to cause physical harm to his or her teacher.

 Further, because it was the students’ behavior that injured plaintiffs, plaintiffs’ prayer for relief with regard to the four named students appears untenable for the simple reason that the alleged injuries were not caused by defendants’ failure to expel the students after the assaults.

 Goss applies because Michigan maintains a public school system, Const 1963, art 8, § 2, and requires children to attend, MCL 380.1561. See Goss, 419 US at 574.

 Most critically, the disciplinary provisions of the school code name not just teachers, but all employees, contractors, volunteers and students. The statutory language nowhere suggests that the Legislature intended for all these subclasses of the public to bring their individual complaints concerning school boards’ disciplinary proceedings to the courthouse.

 See ante at 374 n 23.

 Further, contrary to the majority’s characterization of such analyses, clearly the pre-enactment statements of a legislative staffer are by no means comparable to statements made by official, voting delegates to our constitutional convention, which I reference below.

 See, e.g., Const 1908, art 4, § 1 (“The powers of government are divided into three departments: The legislative, executive and judicial.”); id. at art 4, § 2 (“No person belonging to 1 department shall exercise the powers properly belonging to another, except in the cases expressly provided in this constitution.”).

 The Michigan Constitution also explicitly provides that the Legislature is to exercise the “legislative power” of the state, Const 1963, art 4, § 1, the Governor is to exercise the “executive power,” Const 1963, art 5, § 1, and the judiciary is to exercise the “judicial power,” Const 1963, art 6, § 1.

 It is appropriate to consult constitutional convention debates when, as here, “ ‘we find in the debates a recurring thread of explanation binding together the whole of a constitutional concept.’ ” Studier v Mich Pub Sch Employees’ Retirement Bd, 472 Mich 642, 656; 698 NW2d 350 (2005), quoting Univ of Mich Regents v Michigan, 395 Mich 52, 60; 235 NW2d 1 (1975).

 The delegates agreed that the constitutional advisory opinion provision was unique and intended to be very limited. For example, Delegate Wanger observed: “It has been emphasized by everyone supporting the advisory opinion practice that the courts will exercise restraint, that they will be very careful not to answer every question that is asked but merely to answer those which are of a very, very vital nature.” 1 Official Record, Constitutional Convention 1961, p 1548. Delegate Robert Danhof expressed a similar concern, advocating that the language of the provision should include “an admonition to the supreme court that it is desirable that this particular power be exercised very sparingly and, just as we mean, only upon the most solemn occasions upon very important questions of law.” Id. at 1549.

22 In Nestle Waters, we further rejected this argument when a party argued that the Legislature had conferred statutory standing on it, which should he sufficient even if the party could not meet the basic strictures of constitutional standing. We stated:
Justice Weaver persists in her argument that the textual differences between the federal constitution and our state constitution prove that the exercise of “judicial power” or the doctrine of separation of powers in our constitution means something radically different than it does under the federal constitution. This argument that separation of powers should be understood differently in the Michigan Constitution because the words “case” and “controversy” are not in our constitution suggests to us that Justice Weaver fundamentally misunderstands the doctrine of separation of powers. She refuses to accept that there is a constitutional limit on the Legislature’s authority to expand “judicial power” in the area of standing. In response, we stated in Nat’l Wildlife that
“[a]s the Michigan Constitution makes clear, the duty of the judiciary is to exercise the ‘judicial power,’ and, in so doing, to respect the separation of powers. While as a general proposition, the proper exercise of the ‘judicial power’ will obligate the judiciary to give faithful effect to the words of the Legislature — for it is the latter that exercises the ‘legislative power,’ not the judiciary — such effect cannot properly be given when to do so would contravene the constitution itself. Just as the judicial branch owes *428 deference to the legislative branch when the ‘legislative power’ is being exercised, so too does the legislative branch owe deference to the judicial branch when the exercise of the ‘judicial power’ is implicated. Even with the acquiescence of the legislative and executive branches, the judicial branch cannot arrogate to itself governmental authority that is beyond the scope of the ‘judicial power’ under the constitution. The ‘textual’ approach of [Justice Weaver] is a caricatured textualism, in which the Legislature is empowered to act beyond its authority in conferring powers upon other branches that are also beyond their authority.” [Nat’l Wildlife, 471 Mich at 637 (citations omitted; emphasis in original).] [Nestlé Waters, 479 Mich at 307-308.]

 The majority cites Washington-Detroit Theatre Co, 249 Mich 673, for the proposition that “this Court long ago explained that Michigan courts’ judicial power to decide controversies was broader than the United States Supreme Court’s interpretation of the Article III case-or-controversy limits on the federal judicial power because a state sovereign possesses inherent powers that the federal government does not.” This is precisely correct, but not in the way the majority applies it. In fact, it actually undermines the majority’s conclusion. The majority here either fails to understand or willfully ignores the fact that the federal “case or controversy” requirement limits only the range of controversies that may be heard in federal courts, and that this is distinct from the requirement that an actual case or controversy exists in the first place. In short, that Michigan courts may decide types of controversies that the federal courts lack authority to decide does not mean that Michigan has no constitutional threshold for when a plaintiff may bring such a controversy. The Lee/Lujan standing test does not govern what types of cases/controversies may be brought, only whether a case/controversy exists in the first instance.

 In Richmond, three members of the current majority held that the prosecutor’s case was moot, and therefore did not present an actual case and controversy, although the prosecutor had an interest in appealing the trial court’s adverse evidentiary rulings before voluntarily dismissing the charges. Here, plaintiffs have no recognized interest separate from that of the general public, and no private right of action to vindicate. Thus, ironically, the majority is content to block certain parties from proceeding based on “case and controversy” grounds, while allowing other parties to *430 proceed although they have no legal interests. I can discern no pattern or method other than that the majority wishes to use these cases as vehicles to overturn precedents with which it disagrees, or that it seeks to assist certain parties in achieving their political ends. Neither, of course, is legitimate.

 As this Court explained in Mich Chiropractic Council:
In seeking to make certain that the judiciary does not usurp the power of coordinate branches of government, and exercises only ‘judicial power,’ both this Court and the federal courts have developed justiciability doctrines to ensure that cases before the courts are appropriate for judicial action. These include the doctrines of standing, ripeness, and mootness.
Federal courts have held that doctrines such as standing and mootness are constitutionally derived and jurisdictional in nature, because failure to satisfy their elements implicates the court’s constitutional authority to exercise only ‘judicial power’ and adjudicate only actual cases or controversies.. . . Likewise, our case law has also viewed the doctrines of justiciability as affecting ‘judicial power,’ the absence of which renders the judiciary constitutionally powerless to adjudicate the claim. . . .
Thus, we reiterate that questions of justiciability concern the judiciary’s constitutional jurisdiction to adjudicate cases containing a genuine controversy. [Mich Chiropractic Council, 475 Mich at 370-374 (emphasis in original).]

 Cf. Travelers Ins Co v Detroit Edison Co, 465 Mich 185, 196; 631 NW2d 733 (2001) (“Justiciability doctrines such as standing ‘relate in part, and in different though overlapping ways, to an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government.’ ”), quoting Allen, 468 US at 750, quoting Vander Jagt v O’Neill, 226 US App DC 14, 26-27; 699 F2d 1166 (1983) (Bork, J., concurring).

 House Speaker was decided by this Court before the United States Supreme Court released its opinion in Lujan.

 Detroit Fire Fighters, 449 Mich at 631 (opinion by Weaver, J.) (lead opinion); id. at 650 (Cavanagh, J., joined by Boyle, J., concurring in part and dissenting part); id. at 641 (Riley, J., joined by Brickley, C.J., concurring); and id. at 661 (Mallett, J., joined by Levin, J., concurring in the result only).

 As this Court aptly summarized in Lee, among the various opinions in Detroit Fire Fighters,
[s]ome focused on whether the plaintiff could establish an injury distinct from that of the public, others on whether the plaintiffs were in the zone of interest the statutory or constitutional provision at issue is designed to regulate. Perhaps the clearest template was set forward by Justice Cavanagh, who, along with Justice Boyle, advocated adopting the United States Supreme Court’s Lujan test. [Lee, 464 Mich at 739.]

 See Lee, 464 Mich at 739-740 (incorporating the federal standing analysis articulated in Lujan into Michigan standing jurisprudence); Nat’l Wildlife, 471 Mich at 628-629 (organizational standing and legislative authority to grant citizen standing); Nestlé Waters, 479 Mich at 295-296, 302-303 (legislative authority to grant citizen standing); Rohde, 479 Mich at 354-355 (taxpayer and qui tam standing); Mich Chiropractic Council, 475 Mich 363; Associated Builders & Contractors, 472 Mich 117 (standing necessary in order to seek a declaratory judgment pursuant to MCR 2.605).

 See ante at 357 n 3.

 E.g., the following states do not have an explicit “case or controversy” requirement in their constitutions, yet have adopted or relied on the federal standing test as articulated in Lujan. Alabama — Stiff v Alabama Alcoholic Beverage Control Bd, 878 So 2d 1138, 1142 (Ala, 2003) (applying the Lujan test for standing); Alaska — Chenega Corp v Exxon Corp, 991 P2d 769, 785 (Alas, 1999) (recognizing Lujan)-, Arizona - Bennett, 206 Ariz at 525 (noting that, although “[a]rticle VI of the Arizona Constitution, the judicial article, does not contain the specific case or controversy requirement of the U.S. Constitution,” “federal case law [is] instructive” due to separation of powers principles and as a *437 “matter of sound jurisprudence”); Connecticut — Gay & Lesbian Law Students Ass’n v Bd of Trustees, 236 Conn 453, 466 n 10; 673 A2d 484 (1996) (stating that “[tjhere is little material difference between what we have required and what the United States Supreme Court in Lujan demanded of the plaintiff to establish standing”); Delaware — Dover Historical Society v Dover City Planning Comm, 838 A2d 1103, 1111 (Del, 2003) (noting that “[tjhis Court has recognized that the Lujan requirements for establishing standing under Article III to bring an action in federal court are generally the same as the standards for determining standing to bring a case or controversy within the courts of Delaware”); Georgia — Granite State Outdoor Advertising, Inc v City of Roswell, 283 Ga 417, 418; 658 SE2d 587 (2008) (recognizing Lujan as the appropriate test for standing and noting that “[i]n addition to the constitutional requirements for standing, there is a subset of ‘prudential’ standing requirements that have been developed by the United States Supreme Court”); Hawaii — Akinaka v Disciplinary Bd ofHawai’i Supreme Court, 91 Hawaii 51, 55; 979 P2d 1077 (1999) (utilizing a test comparable to the Lujan test derived from federal caselaw); Idaho — Young v City of Ketchum, 137 Idaho 102, 104; 44 P3d 1157 (2002); Iowa — Godfrey v State, 752 NW2d 413, 418 (Iowa, 2008) (noting that “our doctrine on standing parallels the federal doctrine,” and applying Lujan in the context of a public interest claim); Mississippi — Clark Sand Co, Inc v Kelly, _ So 3d _; 2010 Miss LEXIS 94 (Miss, 2010)* (utilizing the Lujan test); New Mexico — Forest Guardians v Powell, 130 NM 368, 375; 24 P3d 803 (NM App, 2001), quoting United Food & Commercial Workers Union Local 751 v Brown Group, Inc, 517 US 544, 551; 116 S Ct 1529; 134 L Ed 2d 758 (1996) (quoting federal law and applying the same standing criteria used in Lujan), and John Does I through III v Roman Catholic Church of the Archdiocese of Santa Fe, Inc, 122 NM 307, 311-314; 924 P2d 273 (NM App,1996) (noting that “[i]t is not enough to establish standing that an identifiable interest has been injured,” citing the federal definition of “injury in fact,” and concluding that although the “New Mexico Constitution does not speak of Cases or Controversies,” “we are aware of no basis for concluding that those requirements are stricter than those imposed by the federal Constitution”) (citation omitted); North Carolina — Neuse River Foundation, Inc v Smithfield Foods, Inc, 155 NC App 110, 114; 574 SE2d 48 (2002) (quoting the Lujan test); Ohio — Bourke v Carnahan, 163 Ohio App 3d 818, 824; 840 NE2d 1101 (2005) (citing Lujan for the three prong test); Oklahoma — Cities Serv Co v Gulf Oil Corp, 1999 OK 16, ¶ 3; 976 P2d 545 (Okla, 1999) (citing the Lujan test); South Carolina — Sea Pines Ass’n for Protection of Wildlife, Inc v South Carolina Dept of Natural Resources, 345 SC 594, 601; 550 SE2d 287 (2001) (stating that “Lujan set forth the ‘irreducible constitutional minimum of standing,’ ” and adopting the Lujan stan *438 dard); South Dakota — Benson v State, 2006 SD 8, ¶ 22; 710 NW2d 131 (SD, 2006) (recognizing Lujan as the test for standing); Tennessee - ACLU of Tennessee v Darnell, 195 SW3d 612, 620 (Tenn, 2006) (citing Lujan and applying the federal test for standing); Vermont — Parker v Town of Milton, 169 Vt 74, 77-78; 726 A2d 477 (1998) (noting that Vermont has adopted the test for standing articulated in Lujan)-, West Virginia — Findley v State Farm Mut Auto Ins Co, 213 W Va 80, 94; 576 SE2d 807 (2002) (citing Lujan); Wyoming — White v Woods, 2009 WY 29A, ¶ 20; 208 P3d 597 (Wy, 2009) (stating that Lujan established “the irreducible constitutional minimum of standing” and adopting it as the state’s test). Additionally, the following states, whose constitutions also lack an explicit “cases or controversy” requirement, employ a test that is substantially similar to the federal test. Illinois — Greer v Illinois Housing Dev Auth, 122 Ill 2d 462, 492-493; 524 NE2d 561 (1988) (citing federal caselaw and determining that, in order to have standing, “the claimed injury, whether actual or threatened, must be: (1) distinct and palpable; (2) fairly traceable to the defendant’s actions; and (3) substantially likely to be prevented or redressed by the grant of the requested relief”) (citations omitted); Kansas — Sumner Co Bd of Co Comm’rs v Bremby, 286 Kan 745, 761; 189 P3d 494 (2008) (requiring that “a person must demonstrate that he or she suffered a cognizable injury and that there is a causal connection between the injury and the challenged conduct”); Virginia — Va Code Ann 62.1-44.29 (statutorily adopting the same three prong test in the context of water-related claims).

 See, generally, Nat’l Wildlife, 471 Mich at 617-623.

 Notably, Chief Justice Kelly concluded that “Robinson is insufficiently respectful of precedent” and indicated that she “would modify it by shifting the balance back in favor of precedent.” Petersen, 484 Mich at 316-317. This allegiance to precedent is remarkably absent in this case despite the majority’s reliance on Chief Justice Kelly’s Petersen formulation.

 See also Crawford, 466 Mich at 256-257 (per curiam opinion relying on Lee in which Cavanagh, J., concurred).

 The majority argues that, in federal courts and the dozens of states who use the Lujan framework, those entities’ respective constitutions cause serious detriment to the public interest. This alarmist reasoning provides no support for overruling Lee. Indeed, this whole argument underscores the manipulative nature of the majority’s stare decisis test, which here is used to displace a widely accepted and commonly used national standard. More disruptive to the public interest is the state of law to which the majority returns Michigan today: no defined standards, thus allowing litigious individuals to bring unfounded lawsuits against fellow citizens.

 Indeed, of the amici curiae who responded to the majority’s request to file briefs analyzing the correctness of Lee, only one questioned Lee and the cases following it: the National Wildlife Federation (NWF), which was the successful plaintiff in Nat’l Wildlife, 471 Mich 608, which applied Lee. Most notably, even the NWF does not argue that plaintiffs have standing here. Rather, the NWF stresses its belief that if the Legislature expressly grants a plaintiff standing in a statute, the courts should permit the suit without regard to whether the plaintiff also qualifies for standing under the Lee/Lujan test.

 The majority persists in suggesting that Michigan had a clear, workable standing doctrine for “decades” before Lee was decided. To the contrary, our 1993 decision in House Speaker, where the Court was apparently unable to make sense of Michigan’s historical approach to standing, left our standing doctrine muddled and impossible to apply with any consistency.

 The majority’s unexplained suggestion that, in Michigan, “controversy” means something different than throughout the rest of the nation *450 is without basis. As I explain above, the federal “case or controversy” requirement limits only the range of controversies that may be heard in federal courts, and this is distinct from the requirement — common to federal and state law alike — that an actual case or controversy exists in the first place.

 Univ of Mich Regents, 487 Mich at 320-321 (Young, J., dissenting).

 May I sue a landlord under a local noise ordinance for failing to evict my noisy neighbor without notice to my neighbor? May I sue the police department for failing to ticket the teenagers loitering outside my favorite window seat at a local restaurant? In each case, I might allege that the defendant had a duty to enforce a particular law and that I had a “substantial interest” in its enforcement under the facts presented. Further, in each case, the named defendant may be perfectly willing to *452 comply with my demands and happy to do so without arguing, as defendants do here, that the case should not proceed because I have no right to govern his relationship with the third party or affect the absent third party’s rights. This Court expressed similar concerns regarding the view of the judicial power offered by the dissent in Nat’l Wildlife — which the majority today overrules — when discussing environmental suits brought under MCL 324.1701(1) of the Michigan environmental protection act:
Under th[e former dissenting] view of the “judicial power,” “any person,” for example, could seek to enjoin “any person” from mowing his lawn with a gas-powered mower because such activity allegedly creates air pollution and uses fossil fuels when other alternatives are available. “Any person” could sue “any person” for using too much fertilizer on his property, or allowing too much runoff from a feedlot on his property. “Any person” could sue “any person” from using excessive amounts of pesticides in his home or garden or farm. “Any person” could sue “any person” for improperly disposing of used petroleum-based oils. “Any person” could sue “any person” for improper backyard grilling practices, excessive use of aerosol sprays and propellants, or wasteful lawn watering. [471 Mich at 649-650.]
At least the scenarios presented in Nat’l Wildlife involved suits against the allegedly offending party; here, the majority permits plaintiffs to maintain suit despite the absence of the students they seek to punish.

 Members of the executive branch are thus vulnerable to suits filed by any person claiming a substantial interest in their affairs. I note the following timely illustration of what may arise. In the midst of the city of Detroit’s ongoing financial woes and the ongoing crisis in its public school *453 system, an activist group joined teachers and school board members to sue Robert Bobb, the emergency financial manager of the Detroit Public Schools, seeking to challenge the salary terms of his contract with the Governor and the state superintendent of schools. A circuit court judge dismissed the suit, concluding that the plaintiffs did not have legal standing. Marisa Schultz, Judge throws out lawsuit over Financial Manager Bobb’s pay, Detroit News, July 29, 2010. Under the majority’s new approach, their suit seems tenable because all they have to allege is an ill-defined “substantial interest” in the management of local schools.

 See McCormick, 487 Mich at 286-287 (Markman, J., dissenting) (“By nullifying the legislative compromise that was struck when the no-fault act was adopted — a compromise grounded in concerns over excessive litigation, the over-compensation of minor injuries, and the availability of affordable insurance — the Court’s decision today will restore a legal environment in which each of these hazards reappears and threatens the continued fiscal soundness of our no-fault system.”).